# CHARLESTON.

HAYS *v.* HEATHERLY *et al.*

Submitted February 1, 1892.—Decided April 23, 1892.

1. SHERIFF—AFFIDAVIT—SALE—REDEMPTION—DEMURRER.

When a sheriff appends to his list of lands sold for non-payment of taxes the affidavit—"that I am not directly interested in the purchase of any of said real estate"—instead of the affidavit required by statute (Code, c. 31, s. 13)—"that I am not now nor have I at any time been directly or indirectly interested in the purchase of any of said real estate"—such sale is absolutely void (Code, c. 31, s. 9); and if after the expiration of the year to redeem, but before the purchaser has obtained his deed, the owner of the land offers to redeem, and the purchaser refuses and afterwards obtains a deed from the clerk, a bill brought to set aside said tax-deed alleging the above facts and accompanied with the necessary money is good on demurrer. (p. 623.)

2. DEMURRER—PRACTICE—ANSWER.

On overruling the demurrer in such a case the court should not at once decree against defendant as upon a bill taken for confessed, but should award a rule to answer, which rule however need not be served. (p. 634.)

*J. H. Woods* for appellant cited 34 W. Va. 207 ; Code, c. 31, s. 25 ; Blackw. Tax Tit. 261–265 ; Code, c. 30, ss. 18–20 ; Id. c. 4, s. 6 ; 16 W. Va. 345 ; 18 W. Va. 750 ; 19 W. Va. 223 ; 23 W. Va. 675 ; 24 W. Va. 173.

*W. T. Ice* and *Dayton & Dayton* for appellee cited 34 W. Va. 207.

HOLT, JUDGE :

This is a suit in equity brought in April, 1890, in the Circuit Court of Barbour county by plaintiff, Hays, against defendant Heatherly, to set aside a tax-deed. Defendant demurred to the bill, the court sustained the demurrer, dismissing the plaintiff's bill; and plaintiff appealed.

The bill charges, in substance, that plaintiff is a citizen of Gilmer county, distant from Barbour seventy five miles,

where he has but little business and few acquaintances. On 9th October, 1879, by written agreement of that date, he bought from defendant, Bethany Price, about the time she moved from Barbour to Gilmer, a tract of land in Barbour county owned by her, lying on Tygart's Valley river, containing a little over three hundred and thirty two acres, being the same land conveyed to her by John G. Price and others, by deed dated 17th September, 1875, and by ——by deed dated ——;—that the legal title was pretended to be conveyed to plaintiff by Bethany Price by deed dated 17th March, 1880, but plaintiff refused to accept the deed tendered for reasons growing out of the construction of said agreement, whereupon defendant Bethany Price filed her bill in the Circuit Court of Gilmer county against plaintiff to enforce the agreement;—that by reason of the litigation the deed from Bethany Price to plaintiff was never recorded in Barbour, and that the title did not vest in plaintiff until 17th February, 1887, when the merits of the litigation were decided in favor of the said Bethany Price, and that up to December, 1887, when the land was sold for taxes, the said land, described as three hundred and thirty three acres, was assessed and charged upon the land-books of Barbour as in the name of the said Bethany Price;—that prior to the termination of the suit he was the equitable owner of the land, and from thence the legal owner under the decree, and had the right to redeem the same by the payment of the taxes in arrear thereon; and he files as an exhibit a copy of the deed from William Price and Bethany, his wife, to plaintiff, dated 17th March, 1890, which recites the agreement of 9th October, 1879, calling for two hundred acres, and then conveys the same by metes and bounds, and as containing three hundred and thirty two acres instead of two hundred;—that in the month of December, 1887, at a sale of land in Barbour county for the delinquency for the years 1885 and 1886, the sheriff of Barbour county sold the land at public auction for taxes, and defendant Heatherly became the purchaser at the price of thirty five dollars and fifty one cents; and, having caused a report thereof to be made by the county surveyor, obtained a deed therefor on 13th November, 1889, from L. C. Elliott, clerk of the Coun-

ty Court of Barbour county ; and he files a copy of the report and deed as exhibits.

Plaintiff further says that the said sheriff professed to sell the land for the taxes of 1885 and 1886, in arrear, and plaintiff did not know but the taxes had been paid and collected until the year for redemption from the purchaser had passed ; that upon learning the same he offered to redeem the land before defendant Heatherly had obtained his deed, but Heatherly declined the offer, and refused to accept the same, and shortly after obtained his tax deed from the clerk.

Plaintiff alleges six facts as invalidating the deed :

(1) That no such land as plaintiff's, as described in the deed from Price and wife, being described as three hundred and thirty two acres, was delinquent, and that his deed comprises the only land ever owned by Bethany Price containing any considerable number of acres on Tygart's Valley river.

(2) The land returned delinquent for the year 1885 is described by the sheriff's return of delinquent lands to the County Court as a tract of three hundred and thirty acres, and for the year 1886 as a tract of three hundred acres, lying in Philippi district, while the land sold to defendant Heatherly for the year 1886 is described in the sheriff's return of sales as lying in Phillippi independent district, whereas plaintiff avers that the said Bethany Price never owned any land in said independent district, and that said independant district lies within the bounds of Philippi district, but four or five miles from said land.

(3) Plaintiff avers that the return of the delinquent lists for 1885 and for 1886 are signed, respectively, by James A. Williamson, deputy sheriff, and by L. D. Robinson, deputy sheriff, without naming the sheriff for whom they were deputies.

(4) The said delinquent lists were not posted at the front door of the court house of Barbour county for two weeks after the same were signed by said deputies, and certified by the clerk of the county court ; in other words, the said lists, after being signed and certified, were not so posted for two weeks prior to the session of the county court at which

they were presented for examination, as the law requires. On the contrary, they were signed, certified, and presented on the same day.

(5) It does not affirmatively appear that the clerk who subscribed to the *jurat* of the deputy certifying the lists was a person authorized to administer an oath, and he does not show what he is clerk of. And that the list of sales returned by the sheriff does not have appended to it the oath prescribed by law, viz. :   "I am not now, nor have I at any time directly or indirectly been, interested in the purchase of any real estate sold;" but instead thereof, has the following oath :   "I am not directly interested in the purchase of any of said real estate."

The plaintiff files copies of the delinquent returns for the respective years 1885 and 1886, of the return of sales made by the sheriff as exhibits, and says that, by reason of the facts alleged and of said irregularities, he was and is materially prejudiced, and prevented from redeeming the land, and from paying said delinquent taxes, which he otherwise would have done, and that these things are sufficient to invalidate the tax-deed of said Heatherly, upon the payment to him by plaintiff of the purchase money and the taxes since paid thereon by him, together with the costs of said surveyor's report, and the interest on said sums ; and the plaintiff tenders to said Heatherly and brings into court said sum, which he avers amounts to the sum of one hundred and fifteen dollars. Further complaining, he charges that Heatherly is insolvent, is cutting timber, *etc.*, and prays that the tax deed may be set aside, that Heatherly may be restrained from cutting timber, and for general relief.

At the October term, 1890, defendant James E. Heatherly appeared and demurred to plaintiff's bill. Plaintiff joined in said demurrer, and, the defendant assigning no grounds in support of his demurrer, the same was overruled, and defendant was ruled to answer the bill within sixty days, and the cause was continued.

At the February term, 1891, the defendant came again, by his attorney, and by leave of the court entered his demurrer to the plaintiff's bill, and the plaintiff joined in

the demurrer, and being argued by counsel, and considered by the court, it was sustained; "and, the plaintiff not desiring to amend his bill, it is adjudged, ordered, and decreed that the same be wholly dismissed, and that plaintiff pay defendant his costs, *etc.*"

Plaintiff assigns as error: (1) That it was error to entertain, without any ground being assigned therefor, defendant's demurrer to the bill, after a demurrer had been overruled at the former term, and after defendant had been ruled to answer within sixty days. (2) The court should have entertained the bill, and upon the second demurrer have given plaintiff the relief prayed for.

There was no demurrer in the civil law; none in the ecclesiastical courts. Under the former each pleading had to be submitted to the judge and receive his approval before it could be pleaded—as we would say as to a plea in equity, "had to be set down for argument;" and any objection to a pleading came from defendant by way of exception, which in some sort took the place of a demurrer, as it may still do to some extent in equity pleading as to the sufficiency of a plea, or to an answer, where it does not give plaintiff all the discovery he calls for and to which he is entitled. But the demurrer in equity, which applies only to the bill, was borrowed from the common-law, and is not the equivalent of the common-law demurrer proper.

A demurrer at common-law is, in strictness, no plea, since it neither asserts nor denies any matter of fact, but merely advances a legal proposition, viz., that the pleading demurred to is insufficient in law to maintain the case shown by the adverse party. It may be taken by either party, and to any part of the pleadings, until issue joined. A demurrer, though frequently called an "issue in law," may, with more propriety, be said to tender such issue; for the issue is not formed until there is a joinder in demurrer, which affirms the legal sufficiency of the allegations demurred to—see Gould, Pl. (4th Ed. 1861) c. 9, *passim*; chapter 125, §§ 28–30 Code, (Ed. 1891) p. 801—which has been held to apply to demurrers in equity as well as at common law.

As the office of the demurrer at common-law is to deny,

78

not the truth, but only the legal sufficiency, of the allegations demurred to, it therefore admits all such facts as are well pleaded, and refers the question of law arising upon them to the court. At common-law a general demurrer reached all faults in pleading, formal faults as well as substantial, except in case of demurrer for duplicity; but a demurrer might be special—that is, assign some special cause of demurrer—while the general demurrer, as in our statute, assigns none; and by our statute on a demurrer, unless it be to a plea in abatement, the court shall not regard any defect or imperfection in the declaration or other pleading, whether it has heretofore been deemed mispleading or insufficient pleading or not, unless there be omitted something so essential to action or defence that judgment according to the law and the very right of the cause can not be given. No demurrer shall be sustained because of the omission in any pleading of the words, "this he is ready to verify," or "this he is ready to verify by the record," or "as appears by the record;" but the opposite party may be excused from replying, demurring, or otherwise answering to any pleading which ought to have, but has not, such words therein, until they be inserted. Here section 31, c. 171 (section 29, c. 125) Code 1849, ended, and it evidently had reference to common-law demurrers only.

"This section 31 (29) was so framed as to prevent a demurrer being sustained to any pleading, for such matters of form as theretofore were required to be specially alleged as causes of demurrer, and which, if so alleged, were available; its effect was to abolish special demurrers." 2 Rev. Code (1849) p. 650, note. See *Coyle* v. *Railway Co.*, 11 W. Va. 94.

The statute of 27 Eliz. (1585) had enacted "that from henceforth, after demurrer joined and entered in any action or suit in any court of record within this realm, the judges shall proceed and give judgment according as the very right of the cause and matter in law shall appear unto them, without regarding any imperfection, defect or want of form in any writ, return, plaint, declaration or other pleading, process or course of proceeding whatsoever, except those only which the party demurring shall specially

and particularly set down and express together with his demurrer; and that no judgment to be given shall be reversed by any writ of error for any such imperfection, defect or want of form as is aforesaid, except only such as is before excepted."—This chapter 5 is entitled "An act for furtherance of justice in case of demurrer and pleadings." 18 Eliz. c. 14 (1576.)

But doubts having arisen upon the construction of this statute (of 27 Eliz., 1585) for furtherance of justice in case of demurrer, whether certain particular defects in pleading were to be deemed formal or substantial, the statute of 4 & 5 Anne, c. 16 (1705) was enacted, partly in explanation and partly in extension of the healing operation of the statute made in 27th year of Elizabeth, entitled "An act for the furtherance of justice in case of demurrer and pleadings;" specified a variety of particular defects which, though before deemed substantial, were by this latter act virtually converted into matters of form, and thus aided on general demurrer.

The defects specificially enumerated and cured by this statute of 4 & 5 Anne, c. 16, are: (1) Immaterial traverse. See section 34, c. 125, p. 804, Code W. Va. (1891;) section 32, c. 125. (2) Profert of deeds. See section 33, c. 125. (3) Omission of the words "*vi et armis.*" See sections 9, 10, c. 125. (4) Omission of verification *per recordum* or of a *pro ut patet per recordum.* Section 29, c. 125, already quoted. But these relate to civil actions only; so that formal defects, where available, are still proper subjects of general demurrer, as at common-law in criminal cases.

By the act of March 6, 1882, in general re-enactment, with some amendments, of chapter 125 to section 29, already quoted in part, were added these words: "If nothing be alleged by the demurrant in support of his demurrer, the court, if it overrule the same, shall state that fact in the order; and, if final judgment be obtained in the cause by the party whose pleading is demurred to, the same shall not be reversed by reason of any defect in the pleadings so demurred to." All this, of course, relates to common-law actions alone. It was not necessary in regard to demurrer to bills in equity, which were already subject to

certain rules of pleading and practice, which always required it to express the several causes of demurrer. Mitf. Pl. 213.

Under section 29, c. 125, the distinction between matter of form and matter of substance still remains; also in construing and applying section 9 of chapter 125, which reads: "No action shall abate for want of form, where the declaration sets forth sufficient matter of substance for the court to proceed upon the merits of the case."

In *Heard* v. *Baskerville*, Hob. 233, construing St. Eliz., it was laid down by Lord HOBART, "That without which the right doth sufficiently appear to the court is form;" but that any defect by reason whereof the right appears not is a defect in substance. A distinction somewhat more definite is that "if the matter pleaded be in itself insufficient, without reference to the manner of pleading it, the defect is substantial; but that, if the only fault is in the form of alleging it, the defect is but formal." Gould, Pl. § 18, c. 9, pt. 1, citing *Salomons* v. *Stavely*, 2 Doug. 683. This is about as good a test as can be applied, bearing in mind that some form, up to a certain point, is, in the nature of things, a vital matter of substance, as there can be no substance without form.

Section 30, c. 125, relied upon by plaintiff, reads as follows: "A plaintiff in equity may have any plea or demurrer set down to be argued. If the same be overruled, no other plea or demurrer shall afterwards be received, but there shall be a rule upon the defendant to answer the bill; and, if he fail to appear and answer the bill on the day specified in the order, the plaintiff shall be entitled to a decree against him for the relief prayed for therein." The Code of 1849 (1860) stopped with the clause, "there shall be a rule upon the defendant to answer the bill;" but the Code of 1868, which took effect 1st April, 1869, added for the first time the clause as we now have it: "And, if he fail to appear and answer the bill on the day specified in the order, the plaintiff shall be entitled to a decree against him for the relief prayed for therein."

The section as we find it in the Code of 1860, without the addition made by the Code of 1868, will first be con-

sidered. It is a rule of chancery practice of long standing, and is found in the Code of 1792 and in the Code of 1819. See 1 Rev. Code Va. 1819, p. 256, §§ 55–59; Id. p. 215, §§ 97, 98, 100, 101; *Bank* v. *Nelson,* 1 Gratt. 119; especially *Sutton* v. *Gatewood,* (1819) 6 Munf. 398. "But, after a demurrer has been overruled, a second demurrer will not be allowed, for it would be, in effect, to rehear the case on the first demurrer; as, on argument of a demurrer, any cause of demurrer, though not shown in the demurrer as filed, may be alleged at the bar, and, if good, will support the demurrer." Mitf. Pl. (Eng. Ed. 1827) 217, and cases cited; Story, Eq. Pl. (Ed. 1879) § 460, and notes; 1 Bart. Ch. Pr. 357.

That clause which was added to section 32, c. 171, Code 1860, by the addition made in Code 1868 to section 30, c. 125, was not taken from section 59, c. 71, Code 1819, (see volume 1, p. 257) but suggested by it: "If any defendant shall obstinately insist on a demurrer and refuse to answer, where the court shall be of opinion that sufficient matter is alleged in the bill to oblige him to answer, and for the court to proceed upon, the bill shall be taken for confessed, and the matter thereof decreed accordingly." This was and is the regular chancery practice; for in default of answer, after day given by rule on overruling a general demurrer, the bill is taken against the defendant *pro confesso,* and the matter thereof proceeded in and decreed accordingly. *Jennings* v. *Pearce,* 1 Ves. Jr. 447. See Fost. Fed. Pr. § 122, and Append. rule 34, Eq. Pr. p. 671.

Returning, now, to the nature of a demurrer in equity, we have seen that it is borrowed from the common-law. The only pleading that can be demurred to is the bill, which, of course, includes a cross bill. The ground of demurring to the bill in equity is the same as for demurring to a declaration at law, namely, that upon the face of the bill, and assuming everything stated in it to be true, the plaintiff is not entitled to any relief. See Langd. Eq. Pl. § 94 *et seq.* A demurrer, being founded on the bill itself, necessarily admits the truth of the facts contained in the bill, or in the part of the bill to which it extends; and therefore, as no fact can be in question between the parties,

the court may immediately proceed to pronounce its defi-
nite judgment on the demurrer, which, if favorable to the
defendant, puts an end to so much of the suit as the de-
murrer extends to.    Mitf. Eq. Pl. 14.

The distinction of general and special demurrer, in the
common-law sense, never existed in equity; but, by a gen-
eral demurrer in equity, we mean one which simply says
there is no equity in the bill, or in the common-law form,
as given by the Code.    "The defendant says the bill is not
sufficient in law."    Section 28, c. 125, Code.    But a de-
murrer in equity must, in strictness, express the several
causes of demurrer (Mitf. Eq. Pl. 213;) for one demurrer
may be overruled upon argument and another allowed (Id.
215); that is, where it is good as to one point, and not as to
another.  The rule formerly was that, after a demurrer to the
whole bill had been argued and allowed, the bill was out of
court, and therefore could not be regularly amended; but he
may now amend (see section 12, c. 125) and this is permitted
literally, as far as promotive of the ends of substantial justice;
and, upon overruling the demurrer, leave is always given the
defendant to file his answer.    Bank v. Nelson, 1 Gratt. 108;
Sutton v. Gatewood, 6 Munf. 398.    Because a demurrer in
equity does not admit the truth of the bill, it merely as-
sumes the truth for the sake of argument.    If it be over-
ruled, therefore, it does not follow that the plaintiff is en-
titled to a decree.    The bill must be proved, or be taken
pro confesso by a rule to answer, as provided in section 29;
also in section 44, c. 125.

Plaintiff contends that after defendant's demurrer to his
bill was overruled, at the October term, 1890, and there
was a rule against defendant to answer the bill within sixty
days, leave should not have been given him at the February
term, 1891, to again enter a simple demurrer to the bill, but
that it was the imperative duty of the court to enter a de-
cree in favor of plaintiff against defendant for the relief
prayed for in his bill, namely, setting aside defendants's
tax-deed, etc.    This he insists on in his petition assigning
errors, and in his first and second briefs.    If this had not
been done with his implied consent by joining in the de-
murrer, there would be great force in the argument; for, if

the court at the October term had given defendant time to demur, it would have required him to answer also, in order to avoid further delay in case the demurrer should be overruled. And if an answer had been put in at the February term, 1891, the court could at the hearing have reconsidered any question decided by the demurrer at the preceding October term without another demurrer, provided it went to the merits of the bill as a whole. But, although the statute may be mandatory, nevertheless it may be waived by plaintiff expressly, or by necessary implication, by his joinder in demurrer; as no doubt if he had withheld the joinder, or insisted on an answer, one would have been filed. The record does not show whether an amended bill was filed or not, under section 12, c. 125, but I take it for granted there was none; but, if there had been an amendment, defendant could have again demurred without leave.

This brings us to the real point in dispute—the validity of a tax-deed made by the sheriff for land sold by him as delinquent at a ministerial sale had under chapter 31, p. 205, Code, (Ed. 1891.) In the case of *Coal Co.* v. *Howell,* 15 S. E. Rep. 214, (decided at this term) it became necessary to consider to some extent a judicial sale of delinquent and forfeited lands made by the commissioner of delinquent and forfeited lands, under the acts of 30th March, 1837, and 15th March, 1838.

Under the wise and sagacious leadership of Judges ALLEN and LEE, who were both perfectly familiar with the policy which led to the enactment of these laws, these proceedings were held to be judicial, as contrasted with the other well-known ministerial sales made by the sheriff; and in this way quiet and repose was given to the title to millions of acres of uncultivated, and then unimproved, lands, through the central and southern part of (now) this State, by the doctrine laid down in *Smith* v. *Chapman,* 10 Grat. 445, and other cases, that the proceeding was a judicial one, in the nature of a proceeding against the thing itself; that the policy of the laws on the subject was to quiet titles as far as possible, and to convey a good title under these sales, as far as the commonwealth had the means of so doing. The lines were run off, and new monuments of boundary made where

none existed before, and what few did exist have been neglected or lost. These sales began in 1839, and were wound up by law at the fall term, 1846, most of the sales having been made in 1840, '41, '42, '43—fifty years ago. So that, if their titles were now made to depend upon the identification of the old surveys, that being now in many cases impossible, they would have to be regarded as lands never granted. Hence the doctrine was very generally accepted where these lands lay, by the bar, the courts and citizens generally, that the deed of the commissioner of delinquent and forfeited lands passed all such title as the commonwealth then had.

Any other construction, after the lapse of a half century of neglect as to the existence or locality of the very few corners even then found belonging to the old surveys proceeded against as forfeited, could have but the one effect—that of rendering the present confusion worse confounded, creating insecurity as to the title to this large body of lands, and, instead of quiet and repose, a very large additional element of uncertainty and confusion would be added to that which had long existed in some parts of the State by reason of the ministerial tax sales made by the sheriffs, of which the case in hand is one. To get the true point involved on this demurrer, or rather to catch the legislative intent and policy which inspired the present law on the subject, a brief reference to the laws which have gone before will not be out of place.

The first act upon the subject of sales of delinquent lands by the sheriff was passed in November, 1781, which empowered the sheriff to distrain and sell for taxes lands as well as personal property. Act of May, 1782, required the sale which theretofore might have been on credit to be made for the best price that the sheriff could get in ready money. Act of October, 1782—the sheriff shall sell the smallest number of acres that the lowest bidder will pay the taxes for; and this feature has remained in these laws to this day. See section 6, c. 31, Code. Act Jan. 7, 1788, enacted that the land should not be sold if other property could be found in the county, and required the commissioner of land tax of the county to attend the sale, and, if

the land did not bring half value, he was to bid it in "on account of the public," giving the sheriff a certificate of acquittance, but at a price not to exceed taxes, with the right to the owner to redeem in six months by paying to the treasurer amount of certificate and twenty five *per cent.* damages; or, if within two years, by paying double the amount of the certificate. After that the governor, *etc.*, were to appoint persons to sell the land, and convey the same to the purchaser. In all sales of lands for taxes, where the sheriff or collector, or any deputy or collector, or any person in trust for them, or either of them, or in partnership with them, or either of them, is the last bidder for such land, it shall be considered as held in trust for the payment of the taxes, and may be redeemed by the proprietor, with interest at six per cent., *etc.* And this feature or its equivalent has run through all laws since enacted. Such purchases are now declared absolutely void. See section 9, c. 31, Code. Hence the importance of the oath required to be appended to the list of sales. See section 13, c. 31.

Experience showed that this law would not answer the purpose; hence by act of 27th December, 1790, it was repealed, and in lieu thereof the sheriff was to return sworn delinquent lists to the county court; and the court, if satisfied of its truth, was to direct the same to be certified to the auditor of public accounts, with the names of the owners of each tract, and the place of his abode, where the court can obtain such information. And this feature of sworn delinquent lists has run through all the laws on the subject since. See section 18 *et seq.*, c. 30, Code. And by section 5, Act Dec. 27, 1790, it was further enacted that, in case the tax on any land within this commonwealth shall not be paid for the space of three years, the right to such lands shall be lost, forfeited, and vested in the commonwealth, and it shall be lawful for any person to acquire title to any land so forfeited in the manner prescribed for acquiring titles to waste and unappropriated lands within this commonwealth on the eastern waters by an act entitled, *etc.* See Act 1785 (2 Rev. Code 1819, p. 425.) This act of 1790 was the first forfeiting law.

Act Dec. 20, 1791, authorized the sheriffs to sell certain

79

lands which belong or may belong to the commonwealth, *etc.* Act Nov. 24, 1792—sheriff shall not sell unless the same sell for enough to pay the whole sum due the commonwealth. Act Dec. 13, 1792—sheriff to return sworn delinquent lists of lands, and by section 35: "In case the tax on any tract of land within this commonwealth shall not be paid for the space of three years, the right to such lands shall be lost, forfeited and vested in the commonwealth, and it shall be lawful for any one to acquire title thereto in the manner of granting waste and unappropriated lands." See 2 Rev. Code 1819, p. 525.

Act Dec. 19, 1794—forfeiture not to take place for the space of three years, and returns according to section 34 of previous act. Act Jan. 29, 1803, enacted, that when the taxes upon any tract or survey of land shall have remained unpaid for the space of two years, such tract of land shall be forfeited to the commonwealth, and subject to location, grant, *etc.*, but redeemable within one year. Act Feb. 1, 1806, gave until March 1, 1807, to redeem forfeited lands. Act Jan. 20, 1807, again forfeited lands for nonpayment of taxes for the space of two years; "but it shall not be subject to location and grant, but may be redeemed within three years after the forfeiture accrues." Act Feb. 6, 1809, made forfeited lands redeemable within three years, and until 1st March next after the expiration of said term of three years, making all redeemable on or before March 1, 1810. Then it provides for the sales of forfeited lands on first Monday in March, 1811, and first Monday in August in every year thereafter, by the collector at public auction, *etc.*, and this act was published throughout the United States.

This Act Feb. 6, 1809, practically amounted to but little, because it was year after year suspended and modified, until virtually superseded by Act Feb. 9, 1814; but it is important, as being the exemplar of the act of 1837, with the judicial feature added, as it was, by the last-named act. Act Feb. 5, 1810—omitted lands forfeited, if not entered on the land books within eighteen months, and they shall be sold as forfeited, *etc.* Act Feb. 14, 1811—right to redeem forfeited lands given to 1st November, 1811. Act Jan. 23,

1812—persons who have failed to enter their lands are given to 1st August, 1812, to enter them, and to 1st November, 1812, to redeem all forfeited lands ; and after 1st November, 1812, lands not redeemed were to be sold, but before sale the value was to be estimated by two discreet freeholders, and no sale to take place unless the highest bid exceeds two thirds of such valuation, but before sale the owner may redeem. Act Feb. 19, 1813—further time to redeem and to enter was given until end of next session of the general assembly. Act May 22, 1813, gave further time until March 1, 1814.

Then came Act Feb. 9, 1814, which remains, in substance, to this day as the exemplar of all laws for ministerial sales by the sheriff of lands delinquent for taxes. See 2 Rev. Code 1819, p. 542, and Harlow, Land Laws, p. 119, and chapters 30, 31, Code (Ed. 1891.) Some sales were made under it, and also under the acts of congress of 1798 and 1815, but Act Feb. 9, 1815, was suspended, and the sales held in abeyance.

Act March 10, 1832, beginning with section 8, was a re-enactment of it, but made to apply to lands returned delinquent for the year 1831 and after. Here we find the sheriff's oath, "I am not directly or indirectly," *etc.* By Act Feb. 27, 1835, § 5, that part of Act March 10, 1832, which required annual sales by the sheriff was repealed, and sales were directed to be made in the year 1840, and in every five years thereafter. This is the act, with certain amendments, which we find in Code 1849, c. 35 ; in Code 1849 (Ed. 1860 ;) in Code W. Va. 1868 (Ed. 1887 ;) and in Code W. Va. 1868 (Ed. 1891.) Under these sales, beginning in 1840 and continuing to 1860, both inclusive, a great many tracts were bought in by the sheriffs for the commonwealth. This is the class of lands dealt with by section 4, Art. 9, Const. W. Va. 1863 (see Code 1868, p. 35;) and in addition those that might thereafter be so bought in for the State are dealt with by chapter 13, Const. 1872 (see Code 1891, p. 50.)

The courts construed these ministerial tax-sales so strictly against the purchaser that confidence in such titles was greatly impaired, and almost destroyed, and this construction was kept up notwithstanding section 38, Act Feb. 9,

1814, perpetuated, in substance, in all following acts. See section 29, c. 31, p. 221, Code (Ed. 1891.) In *Yancey* v. *Hopkins*, 1 Munf. 419 (1810) a sale made under the acts of 1781 and 1782 came before the court of appeals, in which the doctrine is applied to it as a ministerial sale, as follows: "Whenever an authority is given to any person or officer by law, whereby the estates or interests of other persons may be forfeited, lost, or otherwise affected, such authority must be strictly pursued in every instance. And any omission or mistake in the performance of those duties which the law prscribes will vitiate the whole proceeding, more especially where an act is in its nature so highly penal that a man may absolutely lose his whole property for a few days' neglect in the payment of a tax which has never exceeded one hundredth part of the valuation thereof by sworn commissioners, and where the law has left the power of enforcing that penalty in the hands of a mere ministerial officer, who may, as in the present case, become the purchaser of the land himself for the bare amount of the tax due therein." Page 426.

In *Christy* v. *Minor*, 4 Munf. 431, (1815,) there was brought in question a deed from a marshal of the Federal Court for a tract of land sold for direct federal tax under the act of Congress of 14th July, 1798, and act of 16th March, 1802, and act of 3d March, 1804. Deed held bad, as wanting proof of authority of the marshal. See *Rockbold* v. *Barnes*, 3 Rand. (Va.) 473, (1825.)

In *Nalle* v. *Fenwick*, 4 Rand. (Va.) 585, (1826) a deed made by sheriff of land sold under acts of 1781 and 1782 came before the court, which held: "When a naked power is given by law to an officer or other person, that power must be strictly pursued, especially if such proceeding involve a forfeiture; and it devolves on him who claims a right under the exercise of such power to show that it was in all respects exactly pursued. Therefore, where land is sold by a sheriff for nonpayment of taxes, it is incumbent upon the purchaser to show that all the steps have been regularly taken which the law requires in such cases."

In *Allen* v. *Smith*, 1 Leigh, 231, (1829) a deed made for land sold by the United States collector of direct tax, im-

posed by act of Congress of 1798, came in question. CARR, J., says: "The very nature of such titles, it seems to me, ought to warn the purchasers to see that all the prerequisites of the law are complied with *ad unguem.*" The deed was held bad, not even *prima facie* evidence of the regularity of the collector's proceedings, nor to be presumed, although twenty two years of quiet possession had been held under the sale and deed.

In *Chapman* v. *Bennett,* 2 Leigh, 329, (1830) it was held that, under a sale made by a sheriff under the statute of 1814 for taxes in arrear, the one claiming under the sheriff's deed must show that the sheriff strictly pursued the statute in the steps preparatory to the sale, and that in this case the deed was held not to have divested the title of the original owner.

In *Wilson* v. *Bell,* 7 Leigh, 22, (1836) a deed for land sold for taxes under act of 1814, was held ineffectual to pass title. CARR, J., says: "These sales and purchases founded on forfeiture deserve no indulgence from the court. It is therefore the well-settled law that he who claims under a forfeiture must show that the law has been exactly complied with." TUCKER, J.: "I will add that these laws of forfeiture ought to be strictly construed, and that there should be no leaning in favor of a transaction by which a tract of thirty acres of land is sacrificed to a purchaser for forty eight cents."

In *Jesse* v. *Preston,* 5 Gratt. 120 (1848) it was held that the deed of the collector made under the act of congress of 9th January, 1815, imposing direct taxes, did not furnish *prima facie* evidence of the regularity of the collector's proceedings; and the party claiming title under the deed must show that everything was done which the law required to be done before making the sale. The opinion in this case was delivered by Judge ALLEN, who put it upon the ground that the act of congress contained no declaration that the conveyances should be deemed *prima facie* evidence of the validity of the sale.

This brings us to the case of *Flanagan* v. *Grimmet,* 10 Gratt. 421 (decided in 1843) which was the leading case upon the subject of ministerial tax sales for more than twenty

years. Judge ALLEN delivered the opinion of the court, of unusual length and fullness for him, in which, with his rare acumen, common sense, sagacity, and learning, he reviews the cases up to that time, and discusses the various tax laws of Virginia. This sale took place under the act of 1814. Judge ALLEN gives the public policy which dictated the law of 9th February, 1814; the law of 10th March, 1832; and then comments upon what was intended by section 38 of the act of February 9, 1814, which section is as follows: "After the time of redemption hereby allowed shall have elapsed, the regularity of the proceedings under which the purchaser at the sale or the literary fund claims title shall not be questioned, nor shall the arrearage of taxes for the non-payment of which such sale was made or such title was vested be denied, so as to affect such sale or title, unless such irregularity, or the fact that such arrearage did not exist, appear on the face of the proceedings, or unless such irregularity or such fact be made to appear by proceedings in court duly commenced before the expiration of such time for redemption, and duly prosecuted to a judgment or decree."

Judge ALLEN, after referring to the rule of strict construction already mentioned as laid down in *Nalle* v. *Fenwick*, 4 Rand. (Va.) 585, and other cases commented upon, proceeds to give the policy which dictated the law of 1809 and 1814, and like laws since; saying, in substance, that under the rule laid down, and the hostile spirit shown in these cases towards ministerial sales for taxes, but few titles claimed under such sales were sustained by the courts, confidence in such titles was greatly impaired, and almost destroyed; and it was manifest that, unless some assurance could be held out to purchasers at sales for taxes that a good title could be acquired, the commonwealth would continue to meet with embarrassments for the want of an adequate mode of subjecting lands to the payment of taxes; and while it was necessary, on the one hand, to protect with care the owner who had paid his taxes, on the other hand it was necessary to give to those who were invited to purchase lands sold by the officer of the commonwealth something like a reasonable assurance of acquiring a good title;

something to justify him in paying taxes thereafter, but especially something to inspire him with confidence in improving the land. The act of February 9, 1814, and laws since in regard to ministerial sales for taxes, plainly show that they were passed with full knowledge of public opinion in regard to the defect in this regard of former laws, as interpreted by such cases as *Yancey* v. *Hopkins,* 1 Munf. 419 ; *Christy* v. *Minor,* 4 Munf. 431 ; *Nalle* v. *Fenwick,* 4 Rand. (Va.) 585 ; and with the purpose of providing a remedy in making such sales valid and *prima facie* good, except so far as the former owner could show the taxes in fact paid, or some ground of relief other than his own indifference or negligence.

*Flanagan* v. *Grimmet* was affirmed and followed in *Hobbs* v, *Shumates,* 11 Gratt. 516 (1854.) See, also, *Randolph Justices* v. *Stalnaker,* 13 Gratt 523 ; *Delaney* v. *Goddin* 12 Gratt. 266. Then came our own cases : *Smith* v. *Lewis,* 2 W. Va. 39, in which opinions are delivered by Judge BROWN and Judge MAXWELL ; *Forqueran* v. *Donnally,* 7 W. Va. 115, in which the general subject is fully discussed by Judge HAYMOND ; also in *Burlew* v. *Quarrier,* 16 W. Va. 108, and *Wyatt* v. *Simpson,* 8 W. Va. 394, in which the land was held to have been redeemed ; *Dequasie* v. *Harris,* 16 W. Va. 360 (1880) in which the subject is fully discussed by Judge GREEN ; *Jones* v. *Dils,* 18 W. Va. 759, in which Judge JOHNSON delivers the opinion on elaborate discussion of counsel ; *Koon* v. *Snodgrass,* 18 W. Va. 320 ; *Williamson* v. *Russell,* Id. 612 ; *Barton* v. *Gilchrist,* 19 W. Va. 223—in which the subject is elaborately argued by counsel, Judge GREEN delivering the opinion of the court ; *Danser* v. *Johnsons,* 25 W. Va. 380, opinion by Judge SNYDER ; *Simpson* v. *Edmisston,* 23 W. Va. 675, in which Judge SNYDER delivers the opinion of the court ; *Summers* v. *Kanawha Co.,* 26 W. Va. 159, Judge WOODS delivered opinion of the court ; *McCallister* v. *Cottrille,* 24 W. Va. 173, in which Judge SNYDER again delivers the opinion of the court ; *Elliott* v. *Shaffer,* 30 W. Va. 347 (4 S. E. Rep. 292) in which Judge WOODS delivered the opinion of the court, see *Campbell* v. *Wyant,* 26 W. Va. 702 ; *Jackson* v. *Kittle,* 34 W. Va. 207, (12 S. E. Rep. 484,) in which Judge LUCAS delivers the opinion of the

court, and which is supposed to rule this case. See, on this subject generally, the very useful and learned discussion in Hutchinson on Land Laws, passim.

But it will be noticed that the case of *Jackson* v. *Kittle* is strictly confined to the point involved : "The law requires the sheriff to append to his return of sales of delinquent lands a prescribed affidavit. If he omits to do so, or omit from such affidavit a material or substantial portion of it, as so prescribed, the clerk should not make the purchaser a deed, and, if the objection is interposed before the deed is made, the sale should be set aside." In my view, the policy of these laws should be upheld by the courts, as indicated in *Flanagan* v. *Grimmel*, for the legislative intent is more manifest now than it was in 1809–1853. The legislature has kept pace with the courts in aiming to require a more liberal construction of the statute, in making the law, as amended, cover the case as decided. Still a strict constructionist, with the old cases as his guide, could, as he yet thinks, drive a coach and four through section 25. Nevertheless the legislative intent has been as plainly manifest as it was by the legislature on 29th January, 1803, when it said by act of that date : "Whereas, numerous inconveniences and losses have accrued to the commonwealth from want of an adequate mode for the subjection of lands to the payment of taxes ; and whereas, it is a principle in well-organized governments that property should be holden subservient to the purposes thereof: Be it enacted that, when the taxes upon any tract or survey of land shall have remained unpaid for the space of two years, such tract or survey of land shall be forfeited to the commonwealth, and subject to location according to the terms prescribed," *etc.*

It is true that the legislature can not by enactment make a ministerial act or proceeding a judicial one, yet these ministerial sales have been held to be constitutional, and these acts for levying taxes and providing the means of enforcement are within the unquestioned and unquestionable power of the legislature. See *Weimer* v. *Bunbarry*, 30 Mich. 202. It is the law of the land, not merely in so far as it lays down a general rule to be observed, but in all the proceeding and all the process which it points out or provides

or, in order to give the sale full operation. See Cooley, Tax'n, 39, 40.

The law as it now stands guards the rights of the landowner with extreme care. The main question is, has he paid his taxes, or, if he has not paid them, what excuse, other than his own neglect, can he give? If he has in fact paid his taxes, then sections 26, 27, c. 31, p. 220, Code 1891, give him the long period of five years after the purchaser has recorded his deed to file his bill in equity, show that fact, and have the sale and deed declared void. Is the owner an infant, married woman, or insane person, then he or she may redeem within one year after the removal of the disability. Section 30, c. 31. If Bethany Price, a married woman, acquired this land before the 1st day of April, 1869, she would still have the power to redeem. One of the deeds to her mentioned in the bill has no date given; the other, in which the date is given, would make it her sole and separate estate, to which the above section would not apply.

This bill is heard upon demurrer, and for the purpose of deciding it, and, for no other present purpose, the facts alleged and shown in the bill must be taken as true, subject to all such inferences of law as fairly arise therefrom. Plaintiff alleges, in substance, that there was such a misdescription of the locality of his land, not in the delinquent lists, but in the list of sales recorded (but not posted) and there appearing, alone and for the first time, that he was thereby materially prejudiced and misled as to what real estate was sold, and thereby prevented from redeeming his land, not knowing for some time what "Price" land had really been sold. But, more than that, the sheriff, with the Code of 1887 in his lap, open at page 212, read as follows: "I, A. B., sheriff," *etc.*, "do swear that I am not now, or have I at any time been, directly or indirectly, interested in the purchase of any of said real estate"—as the oath which the law, for an important purpose, required him to append to such list of sales. Yet, instead of that, he swears and appends the following: "And that I am not directly interested in the purchase of any of said real estate,"—just as much, under the circumstances, as to say: "I have been

at another time interested, and am still indirectly interested, in the purchase," etc.

There may be some overdrawn nicety in some of the negative pregnants to be met with in the common-law books of pleading and practice, but there is nothing of the kind in this, as we have to look at it on demurrer. It is a downright common sense inference. The requirement that he shall state that he is not indirectly interested has been in the form of oath, prescribed for fifty years and more. And if the sheriff had at any time been interested, although not now, or had been or was indirectly interested, although not directly, or if any deputy who did not make the sale was directly or indirectly interested, then section 9, c. 31, declares that such "sale shall be absolutely void, and the title to the real estate sold shall remain in the person in whose name the same was sold."

Before defendant got his deed, but after the year for redemption had run out, plaintiff offered to redeem his land, but the defendant declined the offer and refused the same. Then knowing, as matter of law, that he thereafter had no right to a deed, in any view, he proceeded to obtain one from the clerk, who had only a ministerial duty to perform, and therefore defendant obtained it in violation of law. So that the demurrer should have been overruled, and that is all that we can do here. The cause will have to be sent back for a rule to answer. In equity, the court never pronounces a decree against defendant on overruling his demurrer, there being no answer in, but must award a rule to answer before the bill can be taken for confessed.

REVERSED.    REMANDED.