# CHARLESTON.

State v. Sponaugle et al.

Submitted Feb. 2, 1897—Decided Nov. 30, 1898.

1. CONSTITUTIONAL LAW—*Taxation—Forfeiture—Due Process of Law.*

    That clause of section 6, Art. XIII, of the State Constitution, forfeiting land for the failure of the owner to enter it for taxation, is not in violation of that clause of the fourteenth amendment to the federal constitution restraining states from depriving any person of life, liberty, or property without due process of law. (p. 417).

2. CONSTITUTIONAL LAW—*Due Process of Law.*

    The fourteenth amendment to the federal constitution does not itself define "due process of law." What was such before its adoption continues such It does not prohibit a state from future, new legislation, action, or proceedings necessary, in its judgment, in the administration of its government, so it bear alike on all similarly circumstanced, and be not unusual, oppressive, or arbitrary action, assailing the essential rights of the person. (p. 424).

3. DUE PROCESS OF LAW—*Taxation.*

    Due process of law does not always require judicial hearing. It does in matters of purely judicial nature, but not in matters of taxation or matters purely administrative. (p. 424)

4. DUE PROCESS OF LAW— *Supreme Court of United States.*

    It is with the Supreme Court of the United States to determine finally whether legislation or action under state authority is due process of law. (p. 424).

5. DUE PROCESS OF LAW.

    What is due process of law? (p. 418).

6. LACHES—*Tax Sales—Possession.*

    Laches will not bar a landowner from assailing a tax sale of

his land, when there is no actual possession under the tax title. (p. 431).

7.  LACHES—*Statute of Limitations*

Laches is not imputable to the State. Statutes of limitation now run against the State. (p. 431).

8.  TAX SALES—*Warranty—Entry for Taxation.*

A sale of land for taxes is without warranty by the State, and it is not prevented thereby from setting up its right under forfeiture for omission to enter the land for taxes either before or after the tax sale. (p. 432).

9.  TAX SALES—*Estoppel in Pais—Entry for Taxation.*

If a sale for taxes is made and the tax purchaser pays taxes thereafter, the receipt of such taxes will not operate, on the theory of *estoppel in pais* by conduct, to prevent the State from setting up against the tax purchaser a title to land, by forfeiture, for failure of the former owner to enter it for taxation subsequent to or before the tax sale. If the tax title be valid, it would prevent such forfeiture for taxes after the tax sale from its own force, not on the theory of estoppel. (p. 432).

10.  TAX SALES—*Entry for Taxation—Forfeiture.*

A sale of land for taxes, valid to pass title of the owner, will prevent its forfeiture for failure to enter it for taxes in the name of the former owner for years subsequent to the tax sale. (p. 348).

11.  TAX SALES—*List of Sales.*

An omission, in a list of sales of land for taxes, to state the estate of the owner, will not annul the tax deed. (p. 433).

Appeal from Circuit Court, Randolph County.

Suit by the State against G. W. Sponaugle and others. Decree for plaintiff, and defendants appeal.

*Reversed.*

FRANK WOODS, for appellants.

FLICK & WESTENHAVER, for the State.

BRANNON, PRESIDENT:

This was a chancery suit in the circuit court of Randolph County, in the name of the State, against Sponaugle and others, to sell a tract of one thousand two hundred acres of land patented by Virginia to Jacob Sponaugle in 1852, the State claiming title by reason of forfeiture of the land to the State because of its omission from the tax books for five successive years subsequent to 1872. Jacob Sponaugle

conveyed the land to his children, and they were made defendants, as also E. A. Cunningham, who claimed interests in the land by purchase from some of them. The answer of the children of Sponaugle admitted the forfeiture and the liability to sale. Cunningham filed a petition setting up his interests, admitting the forfeiture, and asking to be allowed to redeem the land. This petition and cross bill attacked and sought to set aside a tax deed, and title under it, of the Condon-Lane Boom & Lumber Company. This company was made a defendant to the State's bill, as claiming title to the land; alleging that its claim was void and ineffectual against the State's title under the forfeiture, and that the land was liable to sale under its title by forfeiture. The Condon-Lane Boom and Lumber Company demurred to the bill, and answered setting up that its claim to the land was based on a sale to Cresap in 1871 for taxes for years prior thereto delinquent in the name of Jacob Sponaugle, which tax title had come by conveyance to it, and that this sale rendered the land not taxable after 1871 to Sponaugle, but to Cresap and those claiming under him, and that taxes had been charged and paid in their names for the years in which it was omitted in Sponaugle's name, and for which the forfeiture was alleged to exist. It ·claimed that, if the land was forfeited, it took the benefit of the forfeited title, by reason of alleged possession under the color and claim of title arising from said tax deed and payment of taxes. The decree held the land forfeited, that the lumber company had no title, that its tax title was void, and allowed Cunningham and others claiming interests under Sponaugle to redeem from the forfeiture. The lumber company appeals.

The demurrer and answer of the lumber company challenge the title of the State as conferred by forfeiture, and assert that it had no title under which to attack said company, and is not entitled to sell the land; and this on the theory that section 6, Art. XIII, of the West Virginia Constitution is repugnant to Art. XIV of amendments to the Constitution of the United States, in its provision, "nor shall any state deprive any person of life, liberty or property without due process of law." If this is so, the State has no title to the land. No definite definition—none but

the most general—has been or can be given of "due process of law." The best the courts can do is to say, in each case as it arises, whether a given act or proceeding in the particular matter is due process of law. It depends how the question arises; that is, upon the matter or transaction involved. *Davidson* v. *New Orleans,* 96 U. S., 97. What would be due process if done under the police power or taxing power might not be, in many cases would not be, if not done under either of those powers. 3 Am. & Eng. Enc. Law, 714. A horse may be lawfully seized and sold, without judge or jury, for taxes; but an individual or officer or court or legislature, without trial, generally could not do this. In *Davidson* v. *New Orleans,* 96 U. S., 97, Justice Bradley said: "In judging what is due process of law, respect must be had to the cause and object of taking, whether under the taxing power, the power of eminent domain, or the power of assessment for local improvements, or none of these; and, if found to be suitable or admissible in the special case, it will be adjudged to be due process of law, but, if found arbitrary, oppressive, and unjust, it may be declared to be not due process of law." The clause of the State Constitution in question makes it the duty of the landowner to put his land on the tax books, and provides that "when for any five successive years after the year 1869, the owner of any tract of land containing 1000 acres or more, shall not have been charged on such books, with state tax on said land, then by operation hereof, the land shall be forfeited and the title thereto vested in the state." This provision is to be justified under the taxing power of the state. Its purpose was to raise revenue from vast quantities of land which had been persistently and intentionally omitted by the owner for years from the tax books, and escaped all taxation. What is the limit of the taxing power, except by express provision of the Constitution? It scarcely has any. It is so nearly unlimited from sheer necessity. It involves the operations, nay, the very existence, of government. It is an original power, inherent in every government. Cooley, Const. Lim., 587, does not lay it down too broadly as follows: "The power to impose taxes is one so unlimited in force, and so searching in extent, that the courts scarcely venture

to declare that it is subject to any restrictions whatever, except such as rest in the discretion of the authority which exercises it.   It reaches to every trade or occupation; to every object of industry, use, or enjoyment; to every species of possession; and it imposes a burden, which, in case of failure to discharge it, may be followed by seizure and sale or confiscation of property.   No attribute of sovereignty is more pervading, and at no point does the government affect more constantly and intimately all the relations of life than through the exactions made under it." "The basis of all taxation is political necessity. Without taxes, there can be no revenue; without revenue, there can be no regular government." Burroughs, Tax'n, 1, 3. "All subjects over which the sovereign power of a state extends are objects of taxation." Justice Field said in *State Tax on Foreign-Held Bonds*, 15 Wall., 319:   "It may touch property in every shape,—in its natural condition, in its manufactured form, and in its varied transmutations.   * * * It may touch business in the almost infinite forms in which it is conducted,—in professions, in commerce, in manufactures, and in transportation.   Unless restrained by provisions of the federal constitution, the power of the state as to the mode, form, and extent of taxation is unlimited." In *Witherspoon* v. *Duncan*, 4 Wall., 210, the Supreme Court held that "the states, as a general rule, have the right of determining the manner of levying and collecting taxes on private property."

The states succeeded to the power of taxation of the English parliament after the Revolution, and possess it yet; and we must find in the federal constitution a plain— very plain—prohibition, to restrain this sovereign power, indispensable for our most numerous wants. From quotations above, we see that the state may fasten taxes upon any subject of property. Virginia, very long before the fourteenth amendment, adopted and steadily pursued the policy of holding the land itself liable for its taxes. By frequent acts she directed sale of land for taxes charged and unpaid. Acts of November, 1781; May, 1782; October, 1782; January 7, 1788; December 27, 1790; December 20, 1791; December 13, 1792; February 9, 1814; March 10, 1832; February 27, 1835; 1843; Code 1849; Acts 1859. By some

acts she forfeited lands charged with taxes not paid. Acts of December 27, 1790; December 13, 1792; January 29, 1803; January 20, 1807; April 1, 1831. Acts were passed forfeiting lands not entered on the tax books. Acts of February 5, 1810, and February 27, 1835. Many acts were passed from time to time, through years, giving further time to enter the lands omitted from the tax books, and to redeem lands charged with unpaid taxes. I refer to these many acts running through so many years to show a persistent, fixed policy of Virginia, in one mode and another, to hold the land itself amenable to taxes. West Virginia, since its birth, before the fourteenth amendment, pursued this policy, by adopting the Virginia law for the sale of lands for taxes, and after that amendment by her provision for such sale in her Code of 1868, and by the act of March 4, 1869, forfeiting land for nonentry for taxation. Thus, in Virginia and West Virginia these several modes of holding lands liable had become the "law of the land," as to this matter, before the amendment. Did that amendment come to overthrow this long-established law of the land? That amendment came to defend existing personal rights against unusual, arbitrary actions of the states; to save the citizen his essential rights against the exercise of unwonted, unusual, arbitrary, and unequal power by the state, operating to prejudice him in such essential rights; but I cannot think that it came to defend him against the exercise by the state of its usual powers, under its fixed policy, in a governmental function so indispensable as the collection of revenue. The authorities show that the state can select its subjects of taxation, and select its mode of enforcement and collection. It can distrain personal property and sell it. It can sell realty. Why may it not impose forfeiture, if it deem that a necessary means of getting its revenue? This was "due process of law" of Virginia in this matter of taxation, and complies with the demand of the fourteenth amendment. · A drastic remedy it is, and yet can you say that it is not warranted by that immense power of taxation? Coke's old definition of "law of the land" says that it is that which is according to the "old law of the land." 2 Inst., 50. "Tax laws are laws of the land, and tax proceedings conducted

under equal and uniform laws are due process of law."
*Bardwell* v. *Collins*, (Minn.), 20 Am. St. Rep.,554, note (s.
c. 46 N. W., 315). "Proceedings by which taxes have been
assessed, levied, and collected have always been regarded
as administrative, not judicial, and to constitute due pro-
cess of law, within the meaning of the constitution.   Such
proceedings have been, from necessity, exercised by gov-
ernments, during all times, by summary methods of pro-
cedure.   These methods were in exercise and existence
long before the adoption of the constitution, and  have
never been supposed to be affected thereby."    Ruger, C.
J., in *McMahon* v. *Palmer*, 102 N. Y., 176, (6 N. E., 400).
When that case went to the United States Supreme Court,
the opinion said (what is apt in this case):   "That law had
been in existence over 40 years at the time of this proceed-
ing.   We do not regard the collection in this way, founded
on necessity, and so long recognized by the state of New
York as to be justifiably resorted to under the circum-
stances detailed in the act, and operating on all persons
and property similarly situated, as within the inhibition of
the fourteenth amendment."   *Palmer* v. *McMahon*, 133
U. S., 660, (10 Sup. Ct., 324).   A tax act is "law of the land,
not merely in so far as it lays down a general rule to be
observed, but in all the proceedings and all the process
which it provides in order to give the rule full operation.
The mode of levying is completely and exclusively within
the legislative power."   Cooley, Tax'n, 39.   The author
there shows that the constitution does not restrict this
power under the due process clause. *Kelley* v. *Pittsburgh*,
104 U. S., 78.   The landlord under his distress, the sher-
iff under his tax bill, seize and sell personalty without ju-
dicial process, and the sheriff sells lands for taxes without
it.   Why, since the amendment, is this not unconstitution-
al?   Because those procedures have been settled proce-
dures under the law of the land, and are due process of
law in those particular matters.   So is the remedy
of forfeiture adopted by the state to collect its land
tax.   Is such procedure necessary?   That is for the state
to say.   But forfeiture devests the owner of title.   So does
the distress for rent or taxes devest the owner of personal
property.   It is only another mode of divestiture.   It is

claimed that there must be a judicial inquiry to find the
fact working forfeiture and declaring the forfeiture. This
is so in judicial proceedings, but not in administrative,
summary proceedings.   This cannot be demanded, unless
you say that it is demanded by this particular mode of en-
forcing taxes,—forfeiture,—and not to sales or other
modes; for it is undeniable that no law demands it in pro-
ceedings to collect taxes.   Mr. Justice Harlan sustains
this position in *King* v. *Mullins*, 18 Sup. Ct. 925, and cites
*Murray* v. *Improvement Co.*, 18 How., 272, in which was
considered the case where a distress warrant was issued,
under an act of congress, by the solicitor of the treasury
against a defaulting collector of customs, and the question
was whether it was due process of law; and the court said:
"Tested by the common law and statutes of England prior
to the emigration of our ancestors, and by the laws of
many of the states at the time of the adoption of this
amendment [fifth], the proceeding authorized by the act
of 1820 cannot be denied to be due process of law when ap-
plied to the ascertainment and recovery of balances due
the government from a collector of customs, unless there
exists in the constitution some other provision which re-
strains congress from authorizing such proceeding; for,
though due process of law generally implies and includes
actor, *reus, judex*, regular allegations, opportunities and a
trial according to some settled course of judicial proceed-
ing [citing cases], yet this is not universally true.   There
may be, and we have seen there are, cases, under the law
of England after Magna Charta, and as it was brought to
this country and acted on here, in which process, in its
nature final, issues against the bodies, lands and goods of
certain public debtors without any such trial.   The power
to collect revenue, and make all laws necessary and proper
for carrying that power into effect, includes all known
and appropriate means of effectually collecting that rev-
enue, unless some such means be forbidden in some other
part of the constitution.   It may be added that probably
there are few governments which do or can permit their
claims for public taxes on the citizen or officer for their
collection or disbursement to become subjects of judicial
controversy according to the course of the law of the land.

Imperative necessity has forced a distinction between such claims and all others, which has sometimes been carried out by summary methods of proceeding, and sometimes by systems of fines and penalties, but always in some way observed and yielded to." Justice Harlan cites *Bell's Gap R. Co. v. Pennsylvania*, 134 U. S., 232, (10 Sup. Ct., 533), holding that: "Process of taxation does not require the same kind of notice as in a suit at law, or proceedings to take property under the power of eminent domain. It involves no violation of due process of law, when executed according to customary forms and established usage." And Justice Harlan added: "This must be so, else the existence of government might be put in peril by delays attendant upon formal judicial proceedings for collection of taxes."

So great is this taxing power, that in *Com. v. Byrne*, 20 Grat., 165, a man was arrested and imprisoned under a mere license certificate issued by a commissioner of the revenue, on failure to pay the license tax as a distiller. He was held to be lawfully imprisoned, and it was said that his imprisonment did not violate the requirement of due process of law. Judge Moncure sustained it in an able opinion. The case of *Wulzen v. Board*, 101 Cal., 15, (35 Pac., 353), aptly expresses the idea I would express as to the effect of legislation of Virginia through so many years in the matter of land taxation. That case says: "Taxes are not, as a general rule collected by judicial proceedings; and the procedure resorted to for their imposition and collection may properly be regarded as due process of law, if it conforms to customary usages." The great opinion of Justice Curtis in *Murray v. Improvement Co.*, 18 How., 279, strongly sustains this view: "This legislative construction of the constitution, commencing so early, when the first occasion for this manner of proceeding arose, continued through its existence, and, repeatedly acted on by the judiciary and executive, is entitled to no inconsiderable weight upon the question whether the proceeding adopted by it was due process of law." In *Davidson v. New Orleans*, 96 U. S., 97, it is held: "This court has heretofore decided that due process of law does not in all cases require a resort to a court of justice to assert the

rights of the public against the individual, or to impose burdens on his property for the public use. *Murray* v. *Improvement Co.*, 18 How., 272, and *McMillen* v. *Anderson*, 95 U. S., 37." See *Kentucky Railroad Tax Cases*, 115 U. S., 321, (6 Sup. Ct., 57) If there is anything settled by the United States Supreme Court, it is that the requirement of due process of law does not always require judicial procedure. Justice Miller said in *Davidson* v. *New Orleans*, that the fifth amendment, 'restraining the exercise of power under federal authority without due process of law, though nearly a century old, had scarcely ever been invoked, whereas the fourteenth amendment, adopted in 1866, had filled the docket of the supreme court with cases asking the court to overthrow judgments and legislation of states; that there is abundance of evidence that there exists "a strange misconception of the scope of this provision as found in the fourteenth amendment;" and that it seems every unsuccessful litigant in a state court has made it the means of bringing his abstract opinions of the justice of state decisions and the merits of state legislation before the supreme court. He ridiculed such a construction of the amendment. So have other justices of that court. What is this amendment? Except as a limitation upon state action, it is not new, as respects the demand of "due process of law." That is simply a new application. It only demands of the states what Magna Charta demanded from the time our English ancestors set foot on American soil, and was in the constitution of all the states. For the first time that amendment gave the national government a veto power upon state action upon the citizen not consonant with due process of law, but it gave no new definition of the term "due process of law," or its equivalent, "law of the land." Before it, the state had final right to say whether the act was due process; after it, the supreme court has. That is all. The definition is the same. *Eames* v. *Savage*, 52 Am. Rep., 757. The amendment does not say what due process is. If it had long been established as such in the state, it is due process under the amendment. *Slaughter-House Cases*, 16 Wall., 78. Legislation, action, and procedure long used by the state as usual or customary in the given case were not at once

swept away because not attended with judicial inquiry.
Nor does this amendment cramp the states so as to forbid
the adoption of new legislation, action, or procedure which
they may deem necessary, wise, and politic in the admin-
istration of government.   In either case, so it do not as-
sail the essential right of the citizen under the principles
of common,equal justice, it is valid under this amendment.
*Hurtado* v. *California*, 110 U. S., 537, (4 Sup. Ct. 111, 292),
where a new constitution dispensed with an indictment
for murder, and allowed its trial on information.   The
opinion says:   "However exceptional it [proceeding] may
be, as tested by defintions and principles of ordinary pro-
cedure, nevertheless this, in substance, has been imme-
morially the usual law of the land, and therefore is due
process of law."   This constitutional law, state and fed-
eral, I repeat, is old, and its definition the same at all times;
and yet legislation and procedure under state authority,
and federal, too, levying taxes, seizing and selling person-
al and real estate for taxes, personal for rent, seizing and
confiscating personalty under the police power, and even
selling a defaulting customs receiver's property under a
warrant issued by an executive officer for a debt arising
from his collection of tariff, and imprisonment under a
mere license tax bill, have not been discovered to be with-
out due process.   The fourteenth amendment is highly
salutary as a part of the federal constitution, properly con-
strued and applied, as it has been thus far by that emin-
ent tribunal, the Supreme Court of the United States; but
it cannot be given the scope often claimed for it, practical-
ly denying to the states powers highly essential in the ad-
ministration of the government.   This construction has
been several times repudiated by the supreme court.

How has this question of forfeiture for taxes been re-
garded by the Virginia courts?   They have been unable
to discover that it is not due process of law.   It is true
that in *Kinney* v. *Beverley*, 2 Hen. & M., 318, where the act
of 1790 which provided that lands on which taxes should
not be paid for three years "shall be lost, forfeited and
vested in the commonwealth," Judge Tucker did express
the opinion that, without office found, the state could not
take title, as it was only by record the king could take

title, not definitely saying the act was invalid. Judge Roane (than whom no one has a higher name among Virginia jurists) said, "I cannot for a moment doubt the power of the legislature to pass the law in question;" and he said that no inquest of office was necessary, and that such a construction would defeat collection of revenue. Judge Green's opinion does not mention the subject. So this case cannot be quoted (as it is sometimes) as against the validity of forfeiture acts, as it was decided on other points. In *Wild* v. *Serpell*, 10 Grat., 405, it was held that "the statutes of Virginia forfeiting land to the commonwealth for the failure of the owners to enter them upon the commissioner's books and pay taxes are constitutional," and that title vested under them in the state without judgment, decree, or inquest of office. Several cases uphold the statute. *Staats* v. *Board*, 10 Grat., 400; *Levasser* v. *Washburn*, 11 Grat., 572; *Smith* v. *Chapman*, 10 Grat., 445; *Hale* v. *Branscum*, *Id.*, 418; *Usher* v. *Pride*, 15 Grat., 190. These cases are unsatisfactory in not discussing the matter, but they do decide it, though in but one was it expressly mentioned. In *Armstrong* v. *Morrill*, 14 Wall., 120. the constitutional point was not discussed, but the Virginia forfeiture acts were recognized as operative. So it was settled in Virginia. In West Virginia, our courts, in many decisions, have recognized the Virginia decisions as binding authority. *Twiggs* v. *Chevallie*, 4 W. Va., 463; *Smith* v. *Tharp*, 17 W. Va., 221. And this State adopted this forfeiture policy as her only weapon, as shown by long experience, to compel payment of taxes on vast areas of wild, unseated land, by an act in 1869, and in 1872 by the Constitution containing the forfeiture clause in question, and by several later acts to enforce it. Several decisions recognize the validity of these laws, not by express decisions on the constitutional point, as our courts and bar treated the Virginia cases, and our cases in 4 and 17 W. Va., as settling it under the doctrine of *stare decisis*, but by recognizing these laws as binding law. *McClure* v. *Maitland*, 24 W. Va., 561; *Auvil* v. *Iaeger*, *Id.*, 583; *McClure* v. *Mauperture*, 29 W. Va., 633, (2 S. E., 761); *Tebbets* v. *City of Charleston*, 33 W. Va., 705, (11 S. E. 23); *Hays* v. *Camden*, 38 W. Va., 109, (18 S. E., 461); *Wiant* v. *Hays*, 38 W. Va.,

68, (18 S. E. 807); *Coal Co.* v. *Howell,* 36 W. Va., 489, (15 S. E. 214). Judge Goff, in the United States circuit court for West Virginia, held this clause of our Constitution valid in *King* v. *Mullins.* Titles to thousands upon thousands of acres, the homes of our people, rest upon this long line of enactment and decision; and for this Court to reverse so many cases, and annul the constitutional provision, would shake those titles, and turn thousands from their homes. The rule of *stare decisis,* binds us to adhere to them, especially as titles to property rest on those decisions. Not to do so would spread disaster, the extent of which would be appalling. And this is a consideration justly and deeply entering into the question, as the United States Supreme Court said, speaking through Justice Harlan, in *King* v. *Mullins,* decided in 1898. That court unanimously affirmed Judge Goff's decision holding valid the clause of the constitution in question. I shall not say that the opinion holds that clause, taken alone, valid, though it virtually does so. The opinon holds that as, in connection with the state constitution, the statutes to sell land as forfeited give the owner a hearing, "there is no ground for him to complain that his property has been taken without due process." In *Read* v. *Dingess,* 8 C. C. A., 389, (60 Fed., 21), it was held by the circuit court of appeals (Fourth circuit) that the clause of the West Virginia Constitution was not against the fourteenth amendment. Judge Goff holds the same in *Van Gunden* v. *Iron Co.,* 3 C. C. A., 229, (52 Fed., 851). Another element in this question is not to be overlooked. The State Constitution (section 4, Art. XIII) provides for a sale of the forfeited land, and, by section 5, gives the owner the excess of its proceeds after paying taxes. This relieves the forfeiture clause from the charge of being arbitrary spoliation and confiscation of property; gives to it the hue of being only a step necessary to collect the taxes, showing that after that the state regards his right by holding in trust for him. I therefore reach the conclusion that this forfeiture clause is not repugnant to the fourteenth amendment.

A point that is pressed against the State Constitution is that it, *ipso facto,* devests the owner of his title, and vests it in the State without judicial inquiry,—without what is

called "office found" at common law. If this is so, it is within the power of the State, under the tax power, to do so. "A legislative act directing the possession and appropriation of the land is equivalent to office found. The mode of asserting or assuming the forfeited grant is subject to the legislative authority of the government. It may be after a judicial investigation, or by taking possession directly under the authority of the government, without these preliminary proceedings." *U. S.* v. *Repentigny,* 5 Wall., 267, 268. Can it, indeed, be said that the owner has irretrievably lost his land, without a hearing to contest the forfeiture? It is beyond doubt that the state has power to forfeit land, and vest title in itself, for delinquency or nonentry for taxes, if it leave a door open for hearing. If the Constitution had declared a forfeiture, and expressly given a hearing, no question could arise. It has declared a forfeiture, and has not shut the door against the owner to contest it. It simply declares that, if a fact exist, forfeiture ensues, as a legal consequence. It only says that a certain offense shall involve a certain penalty. All criminal or penal laws do this, but final conviction and penalty are to come after trial. It seems to me, we cannot consider the clause invalid, when privilege of contestation is not denied. Under the law before the act of 1882, a decree in a proceeding to sell land as forfeited was, while conclusive upon strangers, only *prima facie* evidence of forfeiture as against the owner. *Coal Co.* v. *Howell,* 36 W. Va., 489, (15 S. E. 214); *Strader* v. *Goff,* 6 W. Va., 257. In fact *Twiggs* v. *Chevallie,* 4 W. Va., 463, holds the jurisdiction as limited and special, and based only on forfeiture; and, if the land was not in fact forfeited, the decree would be void. It is perhaps immaterial whether *prima facie* or not, it surely not being conclusive. So, when the owner's title is in any way assailed, he can deny the forfeiture. It may be questioned whether the party claiming under the forfeiture must not show it as an original proposition, as the owner was no party. The forfeiting provision does not give the State or a third party taking title possession, but merely vests title, if forfeited. When sued by them, he can contest the forfeiture. If the State could, she has not enacted that he shall be ousted by

force; and therefore, if she or her purchaser desire possession, they must sue, and he can defend, or he can sue the State's tenant or purchaser in possession. This seems, from authority, adequate hearing, if any were required. How is the party prejudiced? Where the door was open to a taxpayer to enjoin, though a bond were necessary, it did not render an act giving a right to levy a tax not due process. *McMillen* v. *Anderson*, 95 U. S., 37. Justice Miller said that as he could sue to recover back the money, as an illegal tax, that would free it from the charge of being without due process. In *Railway Co.* v. *Hunt*, 50 N. J. Law, 308, (12 Atl., 697), there were statutes providing for the destruction of diseased horses; and the court held that these acts are within the police power of the state, and further: "They are not within the prohibition of the fourteenth amendment to the federal constitution, because, although they authorize the abatement of such nuisances in advance of a judicial adjudication of the fact of nuisance, yet they do not make the determination of the officials as to that fact conclusive, and only permit their acts in abating the nuisance to be justified by proof of the actual existence of such nuisance. Plaintiff, however, contends that the determination of the officials that the prescribed disease exists is to be made without notice to the property owners, and without affording them an opportunity to be heard, and on this ground claims that these acts are obnoxious to the constitutional provision invoked. If the legislature by these acts has made the determination of these officials as to the existence of the common nuisance a conclusive adjudication upon the rights of the property owner, then it is perfectly obvious that this legislation cannot be supported. It has been settled in this State that it is not within the power of the legislature to impart to a determination of this sort a conclusive character, as against the property owner, and legislation intending that result was held to be futile. *Hutton* v. *City of Camden*, 39 N. J. Law, 122. An examination of the acts in question clearly shows that there was no intent in the legislative mind to make the conclusions of the officials decisive of the right of the property owner as to the existence of that condition of things which these acts declared would constitute in

these cases a common nuisance and would justify its abatement by the destruction of the animals diseased. The right of the property owner is not thereby barred, on the one hand, nor is the justification of the officials made effective, on the other hand, by reason of their adjudication, but by reason of the fact that the common nuisance declared by the acts existed, and so existed, as to permit the officials to exercise the power of abatement. What the acts authorize is the abatement of an actual nuisance. They afford no protection to any invasion of the right of property in any other case." The court say in conclusion: "But if the property owner is not deprived of a rights to contest the existence of such conditions, and to obtain redress, as for a trespass, if they are not shown to have existed, such legislative acts would not infringe any constitutional provision." So, in *Lawton* v. *Steele*, 152 U. S., 142, (14 Sup. Ct., 499), where a statute authorized officers to destroy nets used in violation of the statute, without any judicial proceedings to ascertain the fact of such violation, the court say: "Nor is a person whose property is seized under the act in question without his legal remedy. If in fact his property has been used in violation of the act, he has no just reason to complain. If not, he may replevy his nets from the officer seizing them, or, if they have been destroyed, may have his action for their value. In such cases the burden would be upon the defendant to prove a justification under the statute." In *Read* v. *Dingess*, 60 Fed. 27, (8 C. C. A., 395), the court said: "But if the act, in every case of its commission, involves the forfeiture, nothing remains but to ascertain the facts of its commission, and that can as well be done in a subsequent suit involving the title as by a proceeding brought by the state to enforce the forfeiture." Also, *Health Dept. of City of New York*, v. *Rector, etc., of Trinity Church*, 145 N. Y., 32, (39 N. E., 833), and *People* v. *City of Yonkers*, 140 N. Y., 23, (35 N. E., 320); *Branson* v. *Gee* (Or.)     Pac., 527. Statutes of limitation take land from one man and vest it in another. Why does no one claim that they violate the Constitution? I suppose because they allow him a hearing afterwards. And the acts of 1872-73 providing for selling the land, gave him right to redeem his land, and so to pay

what he justly owed the State. But since the act of 1882, and especially under that of 1893, for the sale of forfeited land, the proceeding is a regular chancery suit,—must be such,—and the owner must be a party, and is entitled to make full defense against the forfeiture; and surely this is a full hearing before decree, and satisfies the demand for "due process of law." Under the latter statute (chapter 24, Acts 1893) this proceeding was had. It was held by the United States Supreme Court in *King* v. *Mullins*, (1898) that, taking the clause of the Constitution and statute of 1882 in connection, the demand of the fourteenth amendment was satisfied, and the proceeding valid. That is our adequate defense for this decision. I am myself now free from doubt as to the correctness of our holding on this question. 153 U. S., 380.

It is claimed that the State is prevented by laches from assailing the tax deed under the tax sale to Cresap in 1871, twenty-two years having passed from the tax deed to the date of this suit. No possession was ever held under the tax deed. The express statute of limitation did not, therefore, bar the State, and laches does not. Where the adverse claimant of land has no actual possession, the other claimant need not sue. Until then it is mere cloud, never maturing as title. *Battin* v. *Woods*, 27 W. Va., 58. Delay in bringing suit to annul a tax deed is not imputable as laches to the owner. *U. S.* v. *Insley*, 130 U. S., 263, (9 Sup. Ct., 485); *Cook* v. *Lasher*, 42 U. S. App., 42, (19 C. C. A., 654, and 73 Fed., 701); *Sommers* v. *Ward*, 41 W. Va., 80, (23 S. E., 520). The statute of limitations does not, at common law apply to the State. *Hall* v. *Webb*, 21 W. Va., 322. Our statute now applies limitations to the State, like individuals. Code 1891, c. 35, s. 20. But no statute applies laches to the state, and the common-law rule says that it does not apply to it. 12 Am. & Eng. Enc. Law, (1st Ed.) 56.

It is further raised, as a question, that as the State sold to Cresap for taxes, and collected taxes for years from those claiming under that title, it is estopped by this conduct from claiming forfeiture for nonentry in Sponaugle's name in after years,—the very years which the owners under the tax sale were paying taxes for. Now, as the State at

a tax sale sells, not her own land, but only such title as the taxed party has, and by her sale and deed makes no warranty whatever, this estoppel cannot be maintained. And the forfeiture alleged accrued several years after this sale. *Camden* v. *Alkire*, 24 W. Va., 681. An estoppel *in pais* against the state from asserting a title to escheated land is not made out by assessment of taxes, and sale and conveyance for taxes, and the assessment and collection of taxes from the purchaser at the tax sale. An auditor's deed made in consummation of a sale for taxes cannot bar the assertion by the State of any claim or right to the land. The court says the deed is without warranty, and has not, as an estoppel, the force which a quitclaim deed has to pass title in the grantor at its date. *Read* v. *State*, 74 Ind., 252, 260. If it is contended that payment by the tax purchasers of taxes under their title paid the taxes on the land, so that it may be said to the State, "You have already gotten tax once on the land, and you cannot enforce a forfeiture for taxes for the same years in the name of the original owner, whose title we got by the tax sale, we having acquired the land under his title," the response is: "That is so if your tax deed is valid, because there was no title left in the original owner to be taxed, but not so if your tax title is void. If valid, you defeat forfeiture by superiority of your tax title, not by estoppel from conduct, as it does not bind the State in this matter; but, if void, the title was left in the old owner, to be forfeited for taxes, and the State is not bound merely by conduct." And, as to double taxation, *Simpson* v. *Edmiston*, 23 W. Va., 680, holds that there is no privity between former owner and tax purchaser, their claims being hostile, and payment by the tax purchaser does not discharge the state demand for taxes against the former owner, if lawful demand she had against his title as yet good; and, if he wants to deny the validity of the tax sale and keep his title good, he must still keep the land on in his name, just as in case of two stranger titles.

I come, in conclusion, to a very important question: Is the tax sale to Cresap efficient to pass title? It is alleged to be void because of irregularity in the sale lists apparent. If void, leaving title in Sponaugle, the State acquired

title by forfeiture; but, if valid, it devested Sponaugle of title, leaving no land in him to be entered for taxes, and the State had no longer claims to taxes from him. We have concluded that this sale is valid.

One ground of irregularity is that in the column of the list of sales in which the estate (whether in fee or life) of the owner is to be stated there is a blank as to this tract, and so the estate is not given. Code 1868, c. 31, s. 25, it will be. seen, makes sedulous efforts to cure numerous specific irregularities, so as to confer upon purchasers, effectually, such title as the party charged with taxes owned, and also inserts the general provision that the purchaser shall take such title "notwithstanding any irregularity in the proceedings under which the grantee claims title, unless such irregularity appear on the face of the proceedings of record in the office of the recorder, and be such as materially to prejudice the rights of the owner." First, I must say that there would be a presumption of a fee. A deed, under our statute, confers a fee, unless a less estate is stated; and even in a tax-sale list it would be a fair presumption. But who would be misled by it? And, so the owner be not misled, it is no matter as to others. How could he be misled? He would surely know his own estate without information from this list. How does this unsubstantial slip prejudice him? And the same section says: "And no irregularity in the manner of laying off the real estate so sold, or in the plat, description or report of the surveyor or other person, shall, after the deed is made, invalidate the sale or deed." This is a strong curative provision. The sale list is a "report" under it, and the "estate" pertains to the "description." I know the books tell us that, in times past, tax sales were looked upon as forfeitures, and the proceedings must be rigidly regular; but these doctrines do not apply in full force in West Virginia, and ought not to, because our tax-sale system is, and long has been, so large and important to the State in collecting delinquent revenue, and to many buying at her sales, and so important, too, in quieting title and settling the waste places, that the Legislature has, time and time again, in many acts, beginning as far back as 1814, sought to mitigate and qualify, if

not abolish, the strict rule before prevailing, by which almost any irregularity would annul a tax sale, and provided that only substantial errors, capable of working harm to the former owner, and misleading him, and thus prevent timely redemption, should avoid such sale. Each one of these acts has gone further than its predecessor in this effort of liberalization. I referred to this legislation in *Winning* v. *Eakin*, 44 W. Va., 19, (28 S. E. 757), as did JUDGE HOLT in *Hays* v. *Heatherly*, 36 W. Va., 613, (15 S. E. 223). Under this rigid procedure, tax sales were a myth, conferring on the purchaser a certain lawsuit, and as certain defeat; and the State had to buy in, herself, vast quantities of land, which lay in her hands many years, wild and unsettled, paying no taxes, and she lost her revenue. Even to-day, with all this legislation, everybody regards tax titles as dangerous shadows. The State offers the land. The purchaser pays the taxes, and gets nothing. The innocent purchaser is disregarded, and the delinquent landowner is favored. True, it seems hard that he should lose his estate for a pittance, but whose fault is it? Is it the fault of the innocent purchaser? This state of things is not the fault of the Legislature. It has seen the bigness of the evil, and often tried to remedy it. Any one looking at its acts must see that it seeks to favor the innocent purchaser, to the extent of saving him from unsubstantial errors by ministerial officers, and technical defects not injuring the owner. The courts should be alert to execute a plain purpose of the lawmakers, and not to nullify it. And especially it is more difficult, after the sale has been executed by a deed, to annul the sale. The Code itself so intends, as above seen. *Winning* v. *Eakin*, *supra.* I am aware that in *Jones* v. *Dils*, 18 W. Va., 764, the opinion is expressed that the defect in question vitiates a sale; but the syllabus does not announce this as law. And in *Barton* v. *Gilchrist*, 19 W. Va., 230, the same opinion is expressed though it may be called obiter, and is not in the syllabus.

Another irregularity is, as alleged, that the sale list does not show in whose name the land was charged for three out of four years for which it was sold. It shows as to one year confessedly, and a sale for · that year's taxes

would be as efficacious as four. It would call the owner to redeem. But, looking beyond the printed to the manuscript record, we find it plain that it was sold for four years.

Another defect alleged is that in the affidavit to the sale list the sheriff swears that the list contains a true account of all the real estates sold by "me during the present year for nonpayment of taxes due thereon for the years 1863, 1864, 1865, 1866, 1867, 1868, 1869, and 1870 (or some of those years)." The words in parenthesis are claimed to overthrow the whole sale proceeding of Randolph County. This affidavit is intended, perhaps, more to enforce a true account to the treasury than for the benefit of the land owner. By the unnecessary use of the words of surplusage, the sheriff meant to say some tracts were sold for some years, some for others, but the years named covered the years for which this land was sold. Now, it is the list that tells for what particular years the owner's land is sold, and Sponaugle had but to look at it; and that told him his land was sold for 1865, 1866, 1867, and 1868. He should look at the list for this specification, rather than the affidavit. But read both together. The affidavit does not say or intimate that the land was sold for any other than those four years. The years it specified include all the years for which any tract was sold, and the list tells for what particular years a particular tract was sold.

Twenty-two years after the tax deed to Cresap, it is attacked. During all this long period Cresap and his alienees have paid taxes. This, as said above, would not help them, if their tax title were bad; but it is a satisfaction to a court, in rendering judgment, to feel sure that substantial justice is done. The present owners, on the faith of this title, spent a large sum in acquiring the land. The former owners failed to pay taxes charged, let the land be sold, failed to redeem, and afterwards failed to charge their land. They have always been in default, likely because the land was of little value; but now that this land is in reach of the West Virginia Central Railroad, which has pierced that mountain wilderness, and given it life and enterprise, and made land very valuable, and the lumber company is carrying on large operations in cutting timber

on its land very near the line of this tract, the Sponaugle claimants come in to redeem. The suit is in the name of the State, it is true; but the contest is between them and the company, as the State has only a tax claim, and the Sponaugle representatives applied to redeem, and filed a cross bill to assail the tax title, and thus it is their suit. On which side is the equity, if we go by it? But the law decided it for the Condon-Lane Boom & Lumber Company. Therefore we reverse the decree, and dismiss the State's bill and the Cunningham cross bill.

*Reversed.*