NEW AMSTERDAM CASUALTY COMPANY, Appellant, v. ALBIA STATE BANK, Appellee.

No. 40945.

NOVEMBER 17, 1931.

SUPPLEMENTAL OPINION MAY 13, 1932.

542

Stipp, Perry, Bannister & Starzinger, Donald D. Holdoegel, and Mabry & Mabry, for appellant.

Bates & Simmons and Anderson & Perry, for appellee.

DE GRAFF, J.—This action was commenced against the Albia State Bank by the New Amsterdam Casualty Company (appellant) as an assignee under a written assignment signed by Monroe County, Iowa, which county was a depositor at the defendant bank. The plaintiff surety paid the County for the defalcation and forgery of the then County Auditor, W. H. Neighbour, and on September 2, 1927, took the written assignment from Monroe County, which assignment will be presently noted. The deposit in question in the defendant bank was made by the then Treasurer of Monroe County, and consisted of school funds. The defendant bank in its answer pleads:

(1) That the depositor, Treasurer of Monroe County, was negligent in the issuance and delivery of the check in question to the County Auditor of Monroe County, Iowa;

(2) That the depositor and the Board of Supervisors of Monroe County were negligent in not sooner discovering the forgery of the County Auditor Neighbour and in notifying the bank so that the bank could recoup its loss; and

(3) That the depositor and Board of Supervisors were negligent in not notifying the bank upon the discovery of the forgery of said County Auditor.

The facts disclose that W. H. Neighbour was the Auditor

of Monroe County from January 1, 1921, to January 1, 1925, when he was succeeded in office by the election of Isabella Hope, who had been Deputy County Auditor in 1922, 1923 and a part of 1924. The ex-County auditor Neighbour is a self-confessed forger and was indicted in January 1925 for the crime of forgery of a note and mortgage involving school funds on deposit by the Treasurer of Monroe County, to which indictment Neighbour entered a plea of guilty and was sentenced to the State Penitentiary. Neighbour was a witness upon the trial on the indictment and testified that he made the George Lucas school fund loan of $500 and signed the name of George Lucas and wife to the mortgage and took the acknowledgment himself. ''I did not tell them (Lucas and wife) about it. I took the note to the County Treasurer and got a check for $500. I wrote his (Lucas's) name on the back and then wrote my name and cashed it at the Albia State Bank. I got the money and used it myself. There was no application for the loan, no abstract furnished. I made the papers September 6, 1922. I never took the matter up with the Board of Supervisors.'' The record also discloses that there was no appraisement made of the land and that the loan was never approved or disapproved by the Board of Supervisors. He also testified that he made a similar loan in the name of John Haluska and pursued the same method. One of these forged notes was in 1921 for $2000 at the Peoples National Bank and was increased in 1923 to $3350 on the same 40. The $1350 check was cashed at the Iowa Trust & Savings Bank. It appears that the reputation of Neighbour for honesty was considered good six or twelve months after the Lucas mortgage transaction. There was no investigation until Neighbour went out of office in 1925. The state checkers made a general check of the county offices of Monroe County for the year 1923. In the report of the state checkers filed August 9, 1924, concerning the Auditor's office, as shown by Exhibit 13, there is in said report what is termed ''Comments on Auditor.'' In this report it is said that there is considerable carelessness in the handling of school funds in that loans were not scrutinized closely and have not been approved by the Board of Supervisors; that abstracts were not furnished in some cases; that some loans were not filed for record for several months after the making of a loan; that all collections of interest and principal should be paid

direct to the County Treasurer and should not be collected by the Auditor, as has been the custom heretofore. Not until April 29, 1925, did the state checkers in their report, Exhibit O, point out that the school fund loan made to George Lucas in the amount of $500 was a forgery and that the loans made to John Haluska aggregating $3350 were also forgeries.

It may be pointed out that in the latter part of 1923 it was discovered by the Deputy Auditor, Isabella Hope, that some of the school fund mortgages had not been recorded. This did not impeach the honesty of the County Auditor, but was attributed solely to the negligence of Neighbour. The George Lucas mortgage was found by the state checkers in 1923 not recorded, and upon the advice of the checkers the Lucas mortgage was recorded September 26, 1923. The state checkers in their examination of the Auditor's office in 1923 discovered no dishonesty on the part of the Auditor, and in the same year the Board of Supervisors made a check of the school fund loans, but discovered nothing to arouse suspicion. It is true that in 1923 the Deputy Auditor Hope suspected that her superior officer Neighbour had drawn some of his salary in advance, but this matter was adjusted. As heretofore pointed out, on August 14, 1924, the state checkers examined the Auditor's office, but failed to discover any dishonesty or forgery in connection with school fund loans, but did criticize the Auditor for carelessness. The state checker's report (Exhibit 13) was later found in a cupboard behind some adding machine paper, but not until the Auditor's term of office had expired, and consequently said report had never been called to the attention of any other county officer. After the election of Isabella Hope as County Auditor, she broke open a locked box in the Auditor's office and then discovered the original purported $500 note and mortgage of George Lucas. Thereupon, a banker was called to inspect the signatures and declared them to be forgeries. The papers were then presented to George Lucas himself, who denied their genuineness, and the cancelled check was also presented to Lucas, who denied his endorsement thereon. This all happened in the early part of January, 1925, and it was the first time anybody, aside from Neighbour himself, knew of the forgeries. It may also be said that the evidence discloses that the then President of the defendant Albia State Bank reviewed the last state checkers' report, which set

out all the forgeries, and he assisted in obtaining an adjustment from the surety (plaintiff herein) on Neighbour's official bond. At that time the President of the State Bank took the cancelled checks with the forged endorsements from the Auditor's office. At that time the defalcations and forgeries of Neighbour, then ex-County Auditor, became public knowledge, and thereupon Neighbour was promptly indicted, and pleaded guilty to the forgery of a school fund note and mortgage and the endorsement of a school fund check, which was the purported Lucas note, mortgage, and check.

On September 2, 1927, Monroe County, by its officers, assigned to this plaintiff, New Amsterdam Casualty Company, all claims and causes of action against the defendant Albia State Bank. The assignment in question was made in connection with the adjustment between this plaintiff, as surety on Neighbour's official bond, and Monroe County, by reason of the forgeries and defalcations of the County Auditor Neighbour.

On or about January 1, 1925, when the forgeries were first discovered, W. H. Neighbour was indebted to Monroe County for approximately $8000 for funds which he had wrongfully converted. Neighbour was insolvent in substantially the same amount. The only proved assets possessed by Neighbour on or about September 6, 1922, when the forgery in question was committed, were several bank accounts, the total of which was somewhat less than his total defalcations, which accounts were in all probability the money wrongfully abstracted from Monroe County. A brief summary of these accounts may now be stated. Neighbour's account was opened in the Iowa Trust & Savings Bank on August 13, 1924, and on that date he had on deposit $9.95. On March 10, 1925, the balance in the account of W. H. Neighbour, County Auditor, in that bank was $24.29.

Neighbour also had an account with the Albia State Bank, the highest balance of which was $72.00 on September 8, 1924. This account was closed on November 21, 1924. A. J. Roberts was the acting managing officer of the Albia State Bank and he testified that if he had received any notice from the county or county officers that the Lucas check was cashed upon a forged endorsement, the bank ''would have proceeded with legal proceedings to get our money. We would have gone right after Mr. Neighbour. I did not know that the check had been cashed

on a forged endorsement until this suit was instituted. Neighbour was then in the reformatory. We talked it over in the bank and we concluded that Neighbour was then down and out.''

As to the Peoples National Bank, Neighbour carried two accounts, one in his own name and one in the name of the County Auditor. It was opened January 14, 1921. The account did not show any balance on September 6, 1922. It shows that the account was closed on August 3, 1922, and contained no balance thereafter until March 2, 1923, when it was re-opened by a deposit of $2000; that the account remained active from March 2, 1923, until it was finally closed on December 7, 1923, and that the highest balance between March 2, 1923, and December 7, 1923, was $408.60, on May 1, 1923.

In the Farmers & Merchants Savings Bank of Lovilia, Neighbour carried two accounts, one checking and one savings. The checking account opened on May 26, 1922, with a balance of $364.51. The highest amount on deposit in 1922 was $496.52, on December 28, 1922. The highest amount on deposit in 1923 was on May 2nd, in the sum of $1482.29. The highest amount on deposit in 1924 was on May 1st, in the sum of $1564.87. The account was closed on March 4, 1925. During part of this time— from May 31, 1922, to July 26, 1923, Neighbour had a savings account in this bank, opened August 1, 1922, running from $250 to $554.74. This account was closed September 27, 1923.

We now turn to certain legal propositions which have a bearing on the record facts. It may first be said that the school fund is the property of the state, and that in the administration of it the county officers are agents of the state, and for reasons of public policy laches or negligence of the agents of the state in administering its property is not to be attributed to the state. Consequently the defense of negligence on the part of the agents of the state in issuing a check upon the school fund or in failing to discover a forged endorsement thereon and report the same to the defendant-appellee bank is not meritorious. The transaction upon which the instant action is based involves a school fund. We are not dealing with the doctrine of subrogation, but with a written assignment. See National Surety Co. v. Bankers Trust Co., 210 Iowa 323.

The material provisions of the assignment in the case at bar read as follows:

"In Consideration of the sum of $6363.68 in hand paid by the New Amsterdam Casualty Company of Baltimore, Md., receipt of which is hereby acknowledged, the County of Monroe, State of Iowa, * * * do hereby sell, set over and assign to the said New Amsterdam Casualty Company of Baltimore, Md., any and all claims, each and all of them (county and county officers) may have against the Iowa Trust & Savings Bank of Albia, Monroe County, Iowa, arising out of any transactions the said bank had with Wm. H. Neighbour, formerly auditor of Monroe County, Iowa * * *. The said County of Monroe, State of Iowa * * * do further authorize the said New Amsterdam Casualty Company to enforce any claim covered by this assignment as against the said Iowa Trust & Savings Bank and to bring suit thereon. In consideration further of the payment of the sums as set out above, the County of Monroe, State of Iowa, * * * do further sell, set over and assign to the New Amsterdam Casualty Company of Baltimore, Md., any and all claims each and all of them may have against the Albia State Bank of Albia, Iowa, arising out of any transactions the said bank had with Wm. H. Neighbour, formerly auditor of Monroe County, Iowa, and especially the claim against the said bank arising out of the fact that the said bank did on or about September 7, 1922, cash a certain warrant or check issued by the Treasurer of Monroe County, Iowa, to one George Lucas, Sr., the endorsement of the name of George Lucas, Sr., on the back of said check having been forged by William H. Neighbour. * * * and do further authorize the said Amsterdam Casualty Company to enforce any claim covered by this assignment as against the said Albia State Bank and to bring suit thereon. In consideration further of the payment to the County of Monroe, State of Iowa,- * * * by the New Amsterdam Casualty Company as above set out, the County of Monroe, State of Iowa, * * * do hereby release and absolve the New Amsterdam Casualty Company of Baltimore, Md., from any and all obligations assumed by the County under the terms and considerations of a certain official bond on which bond Wm. H. Neighbour was principal and the New Amsterdam Casualty Company, surety, and the State of

Iowa and the County of Monroe obligees which bond was dated June 8, 1921, do further release and absolve the New Amsterdam Casualty Company from any and all obligations assumed by the Company under the terms and considerations of a certain official bond on which bond Wm. H. Neighbour was principal and the New Amsterdam Casualty Company the surety and the State of Iowa and County of Monroe the obligees which bond was dated November 20, 1922.''

This assignment was dated September 2, 1927, and signed by the County of Monroe, State of Iowa, by C. J. Spencer, Chairman of the Board of Supervisors, R. E. Canning, John Lansing, members of Board of Supervisors of Monroe County, James Weatherstone, Treasurer of Monroe County, Iowa, and Isabella Hope, Auditor of Monroe County, Iowa. It may be pointed out that the above assignment wherein the writer of this opinion, for the sake of brevity, inserted stars, contains the names of the signers above mentioned, and that the stars in the body of the assignment itself state especially the particular endorsement of the forged check giving rise to the particular transaction in which Neighbour, as County Auditor, forged, to secure payment from the bank mentioned in the assignment.

It is beyond question that a school fund in the possession of the treasurer of a County belongs to the State. This was declared by this court in 1871 in County of Des Moines v. Harker, 34 Iowa 84. . In that case the action was commenced for recovery of a school fund loan to which the plea of the statute of limitations was made. It was held by this court that the statute of limitations was not a defense, as the school fund was the property of the State, and that the common law maxim ''*nullum tempus occurrit regi*'' applied. In the County of Des Moines case, supra, the court explained the reason why the school fund was the property of the State and not property of the County. The opinion said:

''In other words, it seems to us that the State has the legal title and right to the school fund, that the agents it has, by law, constituted with a view to the successful management of the money and the accommodation of the people of the whole State therewith and thereby, are, in no proper sense, the owners of

the money or parties in interest in the actions, although, by statute, the actions may be brought in the names of such agents.''

See, also, Madison County v. Tullis, 69 Iowa 720 (1886). The doctrine that negligence and laches will not be attributed to the State in the administration of its property found its origin in the United States in the opinion of Justice Story in the case entitled United States v. Kirkpatrick, 9 Wheat. *720, 6 L. Ed. 199 (1824). The doctrine set forth above has been adopted in practically every common law jurisdiction on the broad principle that it is better that the particular individual complaining of laches or negligence should bear the loss rather than to jeopardize the property of the people through the negligence of its employees. See Federal Surety Co. v. Board of Education, 1 S. W. (2d) 954 (Ky-1928). The Supreme Court of Kentucky in Phelps v. Board of Education, 292 S. W. 310, summarized the legal doctrine here involved, and in the opinion, page 311, said:

"The school board is an agency of the commonwealth, a part of the State common school system. * * * (Citing cases.) The state, unless barred by limitation, is not affected by the laches of its officers.''

See, also, In re Moseley's Estate, 164 Pac. 1073 (Kan-1917); Terre Haute & I. R. Co. v. State, 65 N. E. 401 (Ind-1902); State v. Mayor, 52 S. W. 511 (Tenn-1899); State v. Sponaugle, 32 S. E. 283 (W. Va.-1898); 43 L. R. A. 727; People v. Whittemore, 97 N. E. 683 (Ill.-1912).

The fundamental rule recognized by the authorities above cited is that the State and its agents cannot be guilty of laches or negligence in the administration of the property of the State and that the recovery of such property will not be prejudiced or the property itself diminished in value by the negligent acts or want of diligence on the part of the public employees.

Instruction No. 13 stated one of the affirmative defenses relied upon by the defendant and in substance said that the County Treasurer and Monroe County when it learned that the Lucas mortgage, note and check were forgeries should have notified the Albia State Bank of said fact within a reasonable time thereafter, and "if defendant had been then advised of the forgery it could have protected itself against loss, which opportunity to protect itself was lost by it on account of the delay

in bringing the forgery to the attention of the bank or its officers. * * * And if you find from the greater weight or preponderance of the evidence in this case that the Treasurer or Monroe County failed to notify the Albia State Bank of the forgery within a reasonable time after it was discovered, and that the Albia State Bank did not learn of the forgery in time to protect itself from loss on account thereof, and that if it had learned of the forgery within a reasonable time after it was discovered, it could have protected itself from loss on account thereof, then you would be warranted in finding that plaintiff was stopped from recovering in this case and in returning a verdict in favor of the defendant based on this defense alone.''

In Instruction No. 14 the court submitted to the jury the question of whether or not the County Treasurer was guilty of negligence in delivering the check to Neighbour or had reason to believe that he had no authority to receive it.

The trial court was in error in giving to the jury the two foregoing instructions. The trial court was also in error in overruling the fifth paragraph of plaintiff's exceptions to the instruction and the motion for new trial which raised the propositions involved under these instructions.

It has been held that even a negligent delivery of a check to a person other than the payee is not the proximate cause of the loss sustained by the drawee bank cashing the same upon a forged endorsement, and for the reason that there are two intervening causes of loss: First, the forgery by the wrongdoer, and second, the negligence of the bank in cashing the check. See Los Angeles Inv. Co. v. Home Savings Bank, 182 Pac. 293 (Cal-1919); Brixen v. Deseret Nat. Bank of Salt Lake City, 18 Pac. 43 (Utah-1888).

Furthermore, it is claimed by the defendant-appellee that the county and its officers were negligent in not discovering the forgery on the Lucas check between September 6, 1922, when the forgery was committed, and January, 1925, when it was discovered. It must be borne in mind that no forgery of any check on the part of Neighbour was ever discovered by anybody prior to January, 1925, when his defalcations were made known and the whole matter became public knowledge. It was then discovered that during Neighbour's two terms as County Auditor, he had committed three forgeries, chronologically stated, January

14, 1921, September 6, 1922, and May 1, 1923. All of these forgeries were similar and involved the school fund of Monroe County. Neighbour's scheme was such that it would not be discovered even by the purported borrowers without an inspection of the signature by him, or an inspection of the actual signatures by someone familiar with the handwriting of the borrower. True it is that it was learned by the Deputy Auditor that some of the school mortgages had not been recorded, but, as pointed out, even the state checkers thought that this was an act of carelessness on the part of Neighbour. In brief, the defalcations were not discovered until January, 1925, after Neighbour had ceased to be County Auditor. It is not the duty of a depositor to examine returned vouchers to discover forged endorsements. See Dow v. Stockport Savings Bank, 202 Iowa 594 (1926); German Savings Bank v. Citizens Nat. Bank of Davenport, 101 Iowa 530 (1897); McCornack v. Central State Bank, 203 Iowa 833 (1927).

██ Lastly, it appears from this record that the defendant bank was not, and could not have been, prejudiced by the failure on the part of the county or its officers to have discovered the fraud sooner and notified the bank so as to permit it to recoup its loss. We have summarized heretofore the evidence as to Neighbour's financial condition in the different banks. On and immediately prior to January, 1925, when his forgeries were actually discovered, his bank accounts which were his only proved assets had dwindled to substantially the zero point. It appears without contradiction that, had the banks been notified in January, 1925, when the forgeries were discovered, and if the banks had then appropriated all of his bank accounts respectively, the total sum they could have realized is less than Neighbour's defalcations. It is true that the purpose of such notice to a bank of a forged endorsement is to permit the bank to recoup its loss. A drawee bank must affirmatively establish prejudice as a result of the failure of the drawer to give notice of the forged endorsement upon the discovery of the forgery. See Janin v. London & San Francisco Bank, 27 Pac. 1100 (Cal.-1891); 14 L. R. A. 320; Critten v. Chemical Nat. Bank, 63 N. E. 969 (N. Y.-1902); First Nat. Bank v. Allen, 14 So. 335 (Ala.-1893); Murphy v. Met. Nat. Bank, 77 N. E. 693 (Mass.-1906).

We have heretofore given consideration to the material

brief points and argument thereon submitted by appellant. We deem it unnecessary to comment on other points found in the argument of appellee. For the reasons pointed out, we reach the conclusion that the judgment entered must be and is—Reversed.

FAVILLE, C. J., and STEVENS, ALBERT, and WAGNER, JJ., concur.

## Supplemental Opinion.

PER CURIAM: The cause of action for the recovery of school funds wrongfully paid out by the appellee bank was regularly assigned in writing by Monroe County and the officers thereof to the appellant Casualty Company. The appellee bank pleaded negligence on the part of the county and its officers in the issuance of the check to the county auditor and in the failure of the officers to sooner discover the forgery of the endorsement thereon by said county auditor.

Where the rights of innocent third parties are not involved, the quite universal rule of this state is that school funds are the property of the State of Iowa, whose agents are the officers of the county authorized to administer the fund, and that, consequently, the school fund, being the property of the State, cannot be lost or a cause of action for its recovery impaired by the negligence of the public servants charged with the duty of administering the fund. The appellee bank contends that because the county, through its authorized agents, has assigned to the appellant Surety Company the cause of action held by the State for the recovery of the school fund, therefore, defenses may be raised by the appellee based upon negligence of the agents of the State, so as to defeat the cause of action under the written assignment to the appellant Surety Company, altho the cause of action was admittedly good, had the county, acting for the State of Iowa, been the plaintiff, rather than the appellant. In other words, it is the claim of the appellee bank that the cause of action based upon the written assignment by the county to the plaintiff Surety Company constituted a contract personal in its nature and was not assignable.

No authority has been cited by the appellee in support of this contention. The appellee bank relies upon decisions relat-

ing to rights or causes of action which are not assignable, such as the authority of an attorney to represent his client. Antrobus v. Sherman, 65 Iowa 230.

The appellee bank also relies upon the proposition announced and the decisions cited thereunder in 5 C. J. p. 950, Sec. 125. The cases cited under said section125 may be briefly reviewed: Thwing v. Winkler, 75 Pac. 1126, 1127 (Okla.), holds that a right of attachment for fraud does not pass with the assignment of the cause of action for damages. The Winkler case, supra, was followed in Thwing v. Humphrey, 75 Pac. 1127 (Okla.) ; Weaver v. Lawyers Surety Co., 36 Misc. 635, 74 N. Y. S. 462, holding that the assignment of a claim for goods sold does not pass to the assignee the right to rescind the sale; McQueen v. Chouteau's Heirs, 20 Mo. 222, 64Am. Dec. 178, holding that the assignment of a contract by which one has a right of selection of land does not assign the right of choice; and also the following cases to the effect that the sale of property does not pass the right to reclaim taxes or assessments collected illegally or by mistake from the former owner: Bernays v. Wurmb, 4 Mo. App. 231; Pinchbeck v. Mayor, etc., of the City of New York, 12 Hun (N. Y.) 556; Kitchen v. Conklin, 51 Howard's Pr. Rep. 308 (N. Y.) .

It is plain that the sale of property would not transfer a cause of action for the recovery of taxes illegally collected from a transferor, any more than such a conveyance would transfer a cause of action for trespass or other damage to the property occurring before the sale.

Other examples of personal rights which are not assignable may be suggested; for instance, contracts of employment, rights to alimony, or succession to public office.

Clearly the cited precedents by appellee have no bearing on the issue at bar. The established rule that the rights of the State will not be prejudiced or its property lost through the negligence of the public servants is not founded upon a supposed prerogative exempting the State alone from accusations of negligence. As said by Justice Story in the leading case of United States v. Kirkpatrick, 9 Wheaton *720, l. c. 735, 6 L. Ed. 199, which case was discussed in the filed original opinion, 239 N. W. 4:

"The general principle is, that *laches* is not imputable to the government; and this maxim is founded, not in the notion of extraordinary prerogative, but upon a great public policy."

That this doctrine is not founded upon a prerogative exclusively vested in the State is made apparent by the fact that public agents themselves are not personally liable for merely negligent acts committed within the scope of their official duties, on the legal theory that unless the principal is liable the servant is not liable. This general rule has been stated as follows:

"Public officers, when acting in good faith within the scope of their authority, are not liable in private actions." (46 C. J. 1042).

It is said in Packard v. Voltz, 94 Iowa 277, l. c. 281:

"Legally, the county justifies, in that it has done no act for which it is liable, and hence its agent, through whom it did the act, is for the same reason justified."

Therefore, as to all acts which, if done by the principal, the principal would have been justified, no liability exists against the public agent. Many examples of the above legal doctrine are available to illustrate the foregoing rule as to the nonliability of the State.

A superintendent of banking has been held not liable for negligently closing a bank without proper cause, when he did so without intention to do wrong. Sanders State Bank v. Hawkins, 142 S. W. 84 (Tex.).

The director of a school district has been held not personally liable for injury resulting from the explosion of a pressure tank on a school ground inasmuch as he was a public servant and not liable for merely negligent feasance or nonfeasance in office. Antin v. Union High School District, 280 Pac. 664 (Ore.).

A securities commissioner has been held not personally liable for permitting stock to be sold in the state, when he did so without fraudulent intent. Minter v. McSwain, 119 S. E. 901 (S. C.). Accord: McClellan v. Carter, 117 S. E. 118 (Ga.); Overmyer v. Barnett, 123 N. E. 654 (Ind.); Gearin v. Marion County, 223 Pac. 929 (Ore.).

Thus it is seen that for reasons of public policy, negligence cannot be found to exist so far as it concerns the administration of public property. The rule is not merely that negligence cannot be pleaded against the State, because of its supposed prerogatives; for it is held that no cause of action exists even against the agents of the State for mere negligence committed within the scope of their official duties. It follows of necessity that this doctrine is not merely one of pleading or of adjective law, but is one of substantive law, and likewise that in transactions participated in by the State and its agents within the scope of their official authority, negligence in the administration of public property cannot be found to exist. To hold otherwise in this case would be to hold that the State was powerless to assign a cause of action which was admittedly good in itself, merely because an agent of the State has been accused of negligence in the transaction from which the right arose. Such a conclusion would result in a diminution in the value of claims held by the State for the recovery of the school fund for the reason that, as in the cause at bar, a favorable settlement was made by the State with the appellant, because of the fact that the State had a valuable claim to assign for the recovery of its funds.

The petition for rehearing is overruled.